```
                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STEEL WORKERS OF          )
AMERICA AFL-CIO-CLC, a labor     )
organization,                    )
                                 )
             Plaintiff,          )
                                 )
        vs.                      )     Civil Action No. 01-1601
                                 )
PPG INDUSTRIES, INC.,            )     Judge Cercone
                                 )     Magistrate Judge Hay
                Defendant.       )
```

<u>REPORT AND RECOMMENDATION</u>

I.  <u>RECOMMENDATION</u>

        It is respectfully recommended that defendant's motion
for summary judgment pertaining to plaintiff's claims regarding
defendant's Memphis, Tennessee warehouse (Docket No. 95) be
granted, and that plaintiff's refiled motion for summary judgment
(Docket No. 94) be denied.

II.  <u>REPORT</u>

        Presently before this Court for disposition are cross-
motions for summary judgment brought by the parties with respect
to the allegations in the complaint pertaining to PPG's Memphis,
Tennessee warehouse("the Memphis Warehouse").

        Plaintiff, United Steelworkers of America, AFL-CIO-CLC
("the Steelworkers" or "the Union"), commenced this action
against defendant PPG Industries, Inc. ("PPG") under section 301
of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185,
after PPG notified retirees from, <u>inter</u> <u>alia</u>, the Memphis

Warehouse in January of 2001 that it was modifying their medical benefits.[1]  The Union alleges that PPG has reneged on its agreement not to modify or terminate medical benefits for retirees and that PPG's refusal to accept and/or arbitrate the Steelworker's grievance in this regard violates its contractual obligations under the relevant Collective Bargaining Agreements ("CBAs").

Cross-motions for summary judgment have now been filed in which the Union argues that under the broad arbitration clauses contained in the relevant CBAs PPG is obligated to arbitrate the issue of whether the benefits at issue vested and that this Court need only inquire into whether the benefits here are the type that could vest before compelling PPG to do so.  As well, the Union contends that it has provided sufficient evidence

---

[1]     As the Court is probably aware, the Union has also alleged in this case that PPG has violated the terms of Collective Bargaining Agreements governing employment at various other PPG plants. Because of the nuances in the various documents associated with each plant, PPG has filed separate motions as to the Memphis Warehouse, the Fresno Plant, the Springdale Plant and Glass Plants other than the Fresno Plant, which will be dealt with in separate Report and Recommendations.  It should also be noted that there are two related cases to this one in which unions other than the Steelworkers have brought similar allegations against PPG for violating various CBAs negotiated by those unions on behalf of PPG employees at other plants.  See International Chemical Worker's Union Council of the United Food and Commercial Workers Union and its Locals 45C and 776C v. PPG Industries, Inc., C.A. No. 01-1751 and Local Lodge 470 of District 161, International Association of Machinists and Aerospace Workers v. PPG Industries, Inc., C.A. No. 01-2110.  A different set of motions has been filed in each of these cases which will also be addressed separately.

to support a finding that the benefits were meant to vest so as to survive summary judgment.[2]   PPG, on the other hand, has taken the position that it has no duty to arbitrate because the benefits at issue had not vested while the relevant CBAs were in effect.

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.Civ. P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party

---

[2]   We note here that after the original motions for summary judgment were withdrawn, the Court requested that each party wishing to renew its motion after discovery was completed resubmit a completely new motion at the appropriate civil action number so that the record in each case would be self contained and so that the Court would not have to go on a fishing expedition to retrieve the documents needed to resolve each motion.  The Union for some reason was unable to abide by this request and has simply filed a notice that it is reinstating the earlier motion, supporting brief and part of the exhibits filed in this case in April of 2002, on behalf of the plaintiffs in all three cases.  See Docket Nos. 13-22, 114.  As well, rather than file its own comprehensive brief in response to PPG's motions in this case, the Union has submitted a document in which it merely recites provisions of plan documents, see Docket No. 115,  and incorporates the brief filed by the International Chemical Workers Union Council of the United Food and Chemical Workers Union ("ICWUC") in another case.  Thus, the Union's brief submitted in response to PPG's motion here appears as Docket No. 44 in Civil Action No. 01-1751.

will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial* ... or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  Thus, it must be determined "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

PPG initially argues that the primary issue before the Court is whether or not the benefits at issue vested or accrued which, in turn, will dictate whether it should be compelled to arbitrate the instant dispute.  The Union counters arguing that the question of whether the benefits are vested goes to the merits of the dispute and is properly decided in arbitration and that in order to compel arbitration the Court need only determine that the claim at issue is the type that could be vested.  This Court, however, has already rejected the Union's position in this

4

regard and has determined that before arbitration may be
compelled, the Court must first decide whether the rights at
issue, in fact, vested or accrued.

Indeed, review of the record shows that while the
Union's original motion for summary judgment was pending, PPG
filed a motion to compel discovery arguing that it needed
discovery in order to challenge the Union's position posited in
its motion that the benefits at issue vested under the relevant
CBAs.  PPG's position was that because at least some of the
agreements at issue had expired prior to the decision to reduce
benefits, the arbitration provisions contained in those
agreements were inapplicable.  Magistrate Judge Benson, who was
then presiding over the pretrial matters in this case, was
therefore put in the position of having to determine what
discovery, if any, was appropriate under Rule 26(b)(1), while
mindful of the Court's limited authority to decide the underlying
issues involved in a suit to compel arbitration.

In resolving the issue, Magistrate Judge Benson relied
principally on <u>Litton Financial Printing Division v. NLRB</u>, 501
U.S. 190 (1991)("<u>Litton</u>"), which, like the instant case, involved
whether disputes arising under an expired CBA are subject to the
arbitration provision contained therein.  The <u>Litton</u> Court held
that the presumption previously announced by the Supreme Court in
<u>Nolde Brothers, Inc. v. Bakery Workers</u>, 430 U.S. 243
(1977)("<u>Nolde</u>"), that the duty to arbitrate disputes arising
under an agreement outlasts the date of expiration, only applies

5

to "disputes arising under the contract."  The Court went on to
find that "postexpiration grievances can be said to arise under a
contract only where it involves facts and occurrences that arose
before expiration, where an action taken after expiration
infringes a right that accrued or vested under the agreement, or
where, under normal principles of contract interpretation, the
disputed contractual right survives expiration of the remainder
of the agreement."  Litton, 501 U.S. at 205-06.  Magistrate Judge
Benson recognized, as other courts have, that despite the fact
that the Litton Court expressly declined to overrule Nolde, the
two decisions were incongruous.  Memorandum Order, Benson, M.J.
(August 2, 2002) (Docket No. 37).

        In an effort to resolve the apparent "tension" between
Litton and Nolde, Magistrate Judge Benson took instruction from
Luden's Inc. v. Local Union No. 6, 28 F.3d 347 (3d Cir.
1994)("Luden"), in which the Court of Appeals for the Third
Circuit noted, albeit in dicta, that Litton held that "a court
has the *duty* to reach the merits of the claim, and can order
arbitration only if it concludes that the lapsed CBA in fact
creates the right or obligation at issue."  Memorandum Order, p.
6, quoting Luden, 28 F.3d at 353-54 (emphasis in original).
Opining that the rule set forth in Litton was the Supreme Court's
latest and unequivocal statement of the law, Magistrate Judge
Benson applied Litton's holding to the instant case and held
that: "In this case, where post-expiration conduct is alleged to
have violated a right that accrued or vested during the term of a

6

now-expired collectively bargained agreement, the court must make
inquiry into whether the right at issue actually vested or
accrued while the contract was in force."  Memorandum Order, p.
7.

It therefore appears, contrary to the Union's
assertion, that Magistrate Judge Benson has already determined
that the Court must decide whether the benefits at issue vested
or accrued prior to the expiration of the relevant CBAs which, in
turn, will dictate whether the case should be subject to
arbitration.  Because the district court subsequently denied the
Unions' objections to Magistrate Judge Benson's Memorandum Order
it now appears to be the law of the case.  See Order of Court,
Ziegler, J. (October 18, 2002)(Docket No. 46).  See also In re
City of Philadelphia Litigation, 158 F.3d 711, 718 (3d Cir.
1998)(Finding that absent extraordinary circumstances such as the
availability of new evidence, a supervening new law or where the
earlier decision was clearly erroneous, the law of the case
doctrine precludes the reconsideration of previously decided
issues.)

The Union nevertheless makes much of Magistrate Judge
Benson's language that the Court only has to "make inquiry" into
whether the right at issue actually vested or accrued, arguing
that "making an inquiry" into whether the right vested is somehow
distinct from actually determining whether the right vested and
only requires the Court determine if it is the type of claim that
could be vested.  We disagree.

Not only has Magistrate Judge Benson already rejected the Union's position that merely having an arguable basis for asserting that the right to retiree welfare benefits vested under the contract is sufficient to compel arbitration, <u>see</u> Memorandum Order, p. 5, but the Union appears to ignore the rest of the Magistrate's Memorandum Order which, when read as a whole, clearly indicates that the Court is required to determine whether or not the benefits at issue here vested before it can determine whether the Union's claims are subject to the relevant arbitration provisions.  As already discussed, the holding in <u>Litton</u>, as quoted by Magistrate Judge Benson, states that a post-expiration grievance can be said to arise under a contract, thereby giving rise to the presumption of arbitrability, only where, <u>inter alia</u>, "an action taken after expiration infringes on a right that accrued or vested under the agreement."  <u>Id.</u> at 3. It does not say that the presumption applies where the claim at issue is merely the type of claim that could be vested.  Further, Magistrate Judge Benson specifically stated that the issue in <u>Litton</u> was "whether the contractual right at issue 'vested or accrued' while the CBA was in effect."  <u>Id.</u>  He did not interpret the issue as being whether the contractual right at issue was the type that could be vested or accrued.  Indeed, contrary to the Union's suggestion, the <u>Litton</u> majority did not merely find that the right to have seniority considered in making layoffs was not the type of claim that could be vested but, as noted by Magistrate Judge Benson, it found that the right had, in fact,

8

not vested or accrued prior to the expiration of the contract.
Id. at 4.

Moreover, as the Union appears to acknowledge,
Magistrate Judge Benson clearly relied on the Third Circuit's
findings in Luden, which describes Litton as holding that "a
court has the *duty* to reach the merits of the claim, and can
order arbitration only if it concludes that the lapsed CBA in
fact creates the right or obligation at issue." Id. at 6.  The
Luden Court did not find, nor did Magistrate Judge Benson, that
Litton stood for the proposition that the Court is precluded from
reaching the merits of the underlying dispute or that the Court
need only determine if the claim is the type that could be
vested.

Finally, following Magistrate Judge Benson's statement
that "the Court must 'make inquiry' into whether the right at
issue actually vested or accrued while the contract was in
force," he described his findings as requiring the court to
address the merits of the issue.[3]  Under these circumstances, the
Union's position that neither Litton nor Magistrate Judge

---

[3]         Specifically, Magistrate Judge Benson stated
        that, "To say, however, that in this case the
        court must address the merits of the issue, and,
        hence, that the parties are permitted to conduct
        discovery, is not to answer the precise question
        before the court: exactly what discovery is
        proper?"  Memorandum Order, p. 7.

Benson's Memorandum Order requires the court to address the
merits of the dispute or to determine whether the benefits at
issue here actually vested is not only without merit but is
contrary to the law of the case.

As such, we turn to the issue of whether the benefits
at issue in this case vested.

As a preliminary matter, we note that the Union has
argued that, rather than follow Third Circuit precedent in
deciding this issue, the Court should apply precedent as set
forth by arbitrators who have decided vesting disputes because
the parties in this case "bargained for ... a determination by an
arbitrator."  Plaintiff's Brief at p. 36 (C.A. No. 01-1751:
Docket No. 44).  Of course, the difficulty with the Union's
argument, aside from the fact that it has offered no authority to
support its position, is that it remains to be seen whether the
parties bargained for this particular dispute to be arbitrated.
Whether or not the parties agreed to arbitrate is a determination
that is properly made by the Court and, under Third Circuit
precedent, requires the Court -- not an arbitrator -- to decide
whether the benefits at issue vested.  Litton, supra.  The fact
that the Court may simultaneously resolve the issue that the
Union seeks to arbitrate does not appear to be avoidable and
nevertheless does not provide the basis for ignoring the law of
the this circuit.

Indeed, in Litton, the Supreme Court expressly
recognized that it could not avoid the duty of determining

whether the parties agreed to arbitrate a post-expiration dispute simply because that determination would require it to interpret the language of a bargaining agreement, a responsibility typically within the purview of the arbitrator.  Id. at 209.  In fact, the Court proceeded to do just that when, in order to determine whether the dispute over layoffs was arbitrable, it found that the right at issue in that case had not vested during the term of the Agreement.  Id. at 209-210.  Because the issue here, like in Litton, is whether the parties agreed to arbitrate in the first instance, it is an issue properly resolved by the Court under the precedent binding on this Court.

We therefore turn to the Third Circuit's opinion in International Union, United Authomobiule, Aerospace & Agricultural Implement Workers of America v. Skinner Engine Co., 188 F.3d 130 (3d Cir. 1999)("Skinner"), which appears to govern the instant dispute.

As found by the Court in Skinner, ERISA recognizes two types of employee benefit plans: employee welfare plans, which are at issue here, and employee pension plans.  Id. at 137. Although pension plans have elaborate vesting requirements under ERISA, it does not require automatic vesting of welfare benefit plans.  Id.  As the Third Circuit has explained, the difference was not accidental, but, rather, a recognition by Congress that employers need some flexibility regarding their right to alter medical plans due to the fact that the "'costs of such plans are subject to fluctuating and unpredictable variables'" such as

11

"'inflation, changes in medical practice and technology, and increases in the cost of treatment independent of inflation.'" Id. at 138, quoting Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988).

It is undisputed, however, that "in some situations, a welfare plan may provide a vested benefit."  In Re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 58 F.3d 896, 902 (3d Cir. 1995)("Unisys").  See Skinner, 188 F.3d at 138.  It is the plan participant's burden to prove, by a preponderance of the evidence, that the employer intended the welfare benefits to vest for life.  Id. at 138-39.  The Court of Appeals for the Third Circuit, however, has cautioned that:

> to vest benefits is to render them forever unalterable.  Because vesting of welfare benefit plans constitutes an extra-ERISA commitment, an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language.
>
> *          *          *
>
> These cautionary principles apply without regard as to whether the employee welfare benefits are provided under a collective bargaining agreement, SPD [summary plan description], or other plan document; the same underlying considerations are present irrespective of the particular type of document at issue.

Id. at 139.  See Unisys, 58 F.3d at 902 ("[A]ny retiree's right to a lifetime medical benefit under a plan can only be found if established by the terms of the ERISA-governed employee benefit plan .... A court must examine the plan documents.")

It also appears undisputed that while collective
bargaining agreements are generally governed by federal law,
traditional rules of contract construction apply when not
inconsistent with federal labor law.  See Skinner, 188 F.3d at
138.  Moreover, how a plan document or CBA should be interpreted
is typically a question of law and where a CBA is clear and
unambiguous, its meaning must be determined as a matter of law.
Id.

In the instant case, PPG has represented, and the Union
does appear to dispute, that the parties had a collective
bargaining relationship from April 1, 1985, until sometime in
2001, when the Union was decertified as the collective bargaining
representative for the Memphis Warehouse employees.  PPG Exh. 14:
Bono Aff. ¶¶ 4, 5.[4]  Although it appears that the earliest CBA
that could be located by either party is that dated April 1,
1990, it provides that:

> The Employer will extend to eligible
> employees in the bargaining unit the
> Company's Medical Expense Insurance Program
> under the same terms and conditions
> applicable to other participants in the plan.

PPG Exh. 2: 4/1/90 CBA, Article IX, p. 8.  See PPG Exh. 14: Bono
Aff. ¶ 5; PPG Exh. 15: Logan Aff. ¶ 6.

It also appears undisputed that from the outset the
medical insurance program available to Memphis Warehouse
employees was set forth in a separate plan booklet entitled Group

---

[4]      Unless otherwise indicated all of PPG's Exhibits
appear at Docket No. 97.

Insurance Plan or Group Benefits Plan ("GIP").[5]  PPG Exh. 15:

Logan Aff. ¶ 5.  <u>See</u> PPG Exh. 1: 4/1/85 GIP.  With Respect to

benefits extended to employees upon retirement, the April 1, 1985

GIP provides that:

> Retirement
>           If at the time you retire under the
> Pension Plan (other than on a Deferred Vested
> Pension) or the Social Security Act, which
> ever shall occur sooner, you are insured
> under the Program, the following provisions
> will be applicable to your coverage under the
> Program:
>
>                  *      *      *
>
> (c)  Medical Expense Insurance and Dental
>      Expense Benefits
>
>      Such coverage, except Dental
>      Expense Benefits will be continued
>      in effect thereafter at Company
>      Expense, but will be reduced by any
>      benefits provided by Medicare

PPG Exh. 1: 4/1/85 GIP, § 10.7.  <u>See</u> PPG Exh. 15: Logan Aff. ¶ 5.

These provisions, it appears, were repeated, substantially

unchanged, in every Memphis Warehouse CBA and GIP until the last

one in 1998.  PPG Exh. 15: Logan Aff. ¶ 7.

        PPG argues that there is not only no clear and express

language in any of the plan documents governing the Memphis

Warehouse which would indicate a commitment by PPG to vest

retiree medical benefits, but that the language that is contained

in the documents expressly limits PPG's obligation in this

---

[5]           GIPs are also referred to as Summary Plan
        Descriptions ("SPDs"), which is the moniker used
        by the Union.  Because the booklets describing
        the benefits in this case are called Group
        Insurance Plans we have referred to them as GIPs.

respect.  Specifically, PPG points to the April 1, 1985 GIP which

provides that:

> The Company will continue the benefits
> described herein for active and retired
> employees consistent with the terms and
> conditions of the labor agreement for the
> duration of such agreement.... In the event
> of termination of the labor agreement, you
> have the same rights as to claim submission
> and review and conversion rights as you would
> have under individual termination of
> coverage.

PPG Exh. 1: 4/1/85 GIP, p. 3.  See PPG Exh. 15: Logan Aff. ¶ 9.

The labor agreements, in turn, contain a termination provision

which provides that:

> The foregoing constitutes a complete
> Agreement on all questions of wages, hours,
> and working conditions between the Employer
> and the Union.  This Agreement shall become
> effective April 1, 1990, and shall remain in
> full force and effect until 11:59 p.m., March
> 31, 1992, and shall automatically renew
> itself from year to year thereafter unless
> either party desires to modify or terminate
> the Agreement, and files a notice in writing
> of its desire to terminate or modify at least
> sixty (60) days prior to March 31, 1992, or
> prior to March 31 of any subsequent year.

PPG Exh. 2: 4/1/90 CBA, Article XV, p. 11.  See PPG Exh. 14: Bono

Aff. ¶ 10.  This language, it appears, is contained in every

succeeding CBA applicable to the Memphis Warehouse.  PPG Exh. 14:

Bono Aff. ¶ 11.

    Moreover, PPG has represented, and the Union does not

dispute, that the clause contained in April 1, 1985 GIP, cited

above, which limited the extension of benefits to the term of the

labor agreement, was contained in each of the succeeding GIPs

except that in 1992 it was replaced by a reservation of rights
clause as follows:

> The Company plans to continue the benefits
> described herein for active and retired
> employees. However, the Company reserves the
> right to amend, modify or terminate the plan
> at any time as to either active employees,
> retired employees, or both, including
> amendments or modifications which would
> require contributions by employees or
> retirees, or both, as a condition of
> continued participation in the plan.

PPG Exh. 3: 4/1/92 GIP, p. 4.  See PPG Exh. 15: Logan Aff. ¶¶ 10,

11.  As well, it appears that the 1992 GIP contained an appendix

that appeared in all the subsequent GIPs which also provided

that:

> The company has adopted the benefits
> described herein for the exclusive use of
> active and retired employees.  It reserves
> the right to modify or amend the provisions,
> terms, conditions, and benefits of the policy
> and to terminate the plan.  Future
> modifications and amendments to the medical
> plan may include, but are not limited to,
> adjustments to deductibles, co-insurances,
> premium contributions, and similar changes.
> Such modifications and amendments may be made
> in the medical coverage provided to retirees.

PPG Exh. 3: 4/1/92 GIP, Appendix D, p. 88.  See PPG Exh. 15:

Logan Aff. ¶¶ 12, 13.  Under these terms, it would appear that

PPG's obligation to provide benefits was not only limited to the

duration of the then-current CBA but that after 1992 it

maintained the right to modify or terminate retiree benefits at

any time.  Moreover, it appears that each of the GIPs since 1985

was distributed to Memphis Warehouse employees.  PPG Exh. 15:

Logan Aff. ¶ 15.

16

The Union does not dispute that these provisions are contained in the relevant plan documents pertaining to the Memphis Warehouse, nor does it point to any clear and express language in the plan documents which would suggest that PPG intended for retiree medical benefits to vest. Rather, the Union appears to argue that it did not bargain for the duration clauses set forth in the GIPs and that the plan documents are nevertheless ambiguous.

The Union, however, has not provided any support for its position that PPG unilaterally inserted the duration clause in the GIPs or that it was unaware of the fact that they had been included, but instead asks the Court to infer as much from the fact that the clause began appearing in the GIPs somewhere between 1984 and 1987 and that it subsequently became an issue in 1993 after PPG first indicated that a modification in benefits might be forthcoming.[6]

Even if it were true, however, that PPG surreptitiously inserted the language in the GIP, it is undisputed that the language has been included in every GIP since 1985 and that the Union reviewed each GIP prior to its publication. Indeed, Mr. Murphy, formerly a union officer with the Union's predecessor who

---

[6]     Indeed, we note here that because the Union has merely incorporated the brief filed in opposition to PPG's motion for summary judgment at Civil Action No. 01-1751, most of the evidence cited by the Union relates to negotiations involving the ICWUC, and not the Steelworkers, and plan proposals pertaining to plants other than the Memphis Warehouse and, thus, cannot provide the basis for finding a material issue exists in this case.

negotiated labor agreements with PPG, testified at his deposition
that the Union had the opportunity to review each GIP and that if
there were any mistakes or misstatements contained therein the
Union would have an opportunity to call that to PPG's attention.
PPG Exh.: Murphy Depo. p. 125 (Docket No. 119).[7]  Under these
circumstances, it appears unreasonable to infer that the Union
was somehow unaware of the durational clause until 1993 when PPG
decided to make changes in retiree medical benefits.  See Maurer
v. Joy Technologies, Inc., 212 F.3d 907, 919 (6th Cir. 2000)
(Finding that the union was precluded from arguing that the
plaintiffs' retirement benefits vested in light of the
reservation of rights clause that, while unilaterally inserted by
the company, was conspicuously contained in the insurance booklet
and remained uncontested for three years.)

Moreover, notwithstanding whether the Union was aware
of the duration clauses contained in the GIPs, it is undisputed
that the CBAs themselves contain a clause limiting the duration
of benefits.  As previously discussed, each CBA since 1990,
includes termination language.  See PPG Exh. 2: 4/1/90 CBA,
Article XV. p. 11.  Thus, it appears, rather than contain clear
and express language which would demonstrate that PPG intended

---

[7]         Although the Union has referred the Court to a
        letter from the Union's Roy Albert to Herman Bono
        at PPG for the proposition that the Union only
        reviewed the changes made to the GIPs and not the
        entire document, the letter is devoid of any
        language to that effect.  See Union Exh. 6:
        6/12/93 Letter.  Unless otherwise indicated all
        the Union's exhibits appear at Docket No. 116.

the retiree medical benefits to vest, the plan documents contain language indicating just the opposite.

The Union nevertheless argues that the plan documents, and in particular the language contained in the GIPs stating that PPG "will continue" the benefits at issue, are ambiguous, thereby requiring the Court to look beyond the plan documents themselves to decide the vesting issue.

The Court of Appeals for the Third Circuit, however, has specifically rejected the notion that under these circumstances the phrase "will continue" included in provisions providing medical benefits is ambiguous.  To the contrary, in assessing a series of CBAs containing the same "will continue" language at issue here, the Third Circuit found that:

> It cannot be said that the phrases clearly and expressly indicate vesting since there is simply no durational language to qualify these phrases.  That is, the CBAs do not state that retiree benefits "will continue for the life of the retiree," or that they "shall remain unalterable for the life of the retiree."  An equally reasonable interpretation is that the benefits "will continue until the CBA expires," or that they "shall remain ... until the CBA expires." Indeed, the latter interpretation appears to be the more reasonable in light of the durational provisions in all of the CBAs. Section 46 of the 1986-1989 CBA is illustrative: "This Agreement represents a complete resolution of all non economic items and shall, in all of its terms, remain in effect from July 1, 1986 until midnight, June 30, 1989 ...."  Read in conjunction with the durational clauses, the phrases could be interpreted to mean, for instance, that the medical benefits "will continue until midnight of June 30, 1989."

*          *          *

> The phrases, "will continue" and "shall remain," as discussed above, are simply not susceptible to more than one reasonable interpretation, and they do not somehow render the CBA's incomplete or ambiguous.

Skinner, 188 F.3d at 141, 146.

The Union nevertheless attempts to distinguish this case from Skinner and argues that the differences require a finding that the "will continue" language found in the instant case is ambiguous.

The Union first contends that because other courts have reviewed language similar to the "will continue" language at issue here and have determined that such language is ambiguous or vests in favor of retirees this Court should as well.  In so arguing, the Union relies on a series of cases from the Court of Appeals for the Fourth and Sixth Circuits that have followed the Sixth Circuit's holding in International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1983), cert. denied, 465 U.S. 1007 (1984)("Yard-Man"), in which it was found that such "will continue" language creates a presumption that the parties intended retiree welfare benefits to continue for life.  See U.A.W. v. BVR Liquidating, Inc., 190 F.3d 768 (6th Cir. 1999), cert. denied, 529 U.S. 1067 (2000); Keffer v. H.K. Porter Co., 872 F.2d 60 (4th Cir. 1989); Smith v. ABS Industries, Inc., 890 F.2d 841, 847 (6th Cir. 1989).  As acknowledged by the Union elsewhere in its brief, however, the Court of Appeals for the Third Circuit in Skinner specifically, and repeatedly, declined

20

to adopt what has been termed the "Yard-Man presumption" or Yard-Man's interpretation of the relevant contract language.  Skinner, 188 F.3d at 139, 140, 141.  In fact, the Third Circuit subsequently described its opinion in Skinner as creating a presumption against vesting with respect to welfare benefit plans.  Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health and Welfare Plan, 298 F.3d 191, 196 (3d Cir. 2002).  Thus, it appears that the Union's reliance on Yard-Man and its progeny is misplaced.

Nor do the remaining cases cited by the Union compel a different result as the plan documents in those cases, unlike in this case, did not contain any clauses limiting the duration of benefits or the terms of the agreement.  See Rossetto v. Pabst Brewing Co., 217 F.3d 539 (7th Cir. 2000), cert. denied, 531 U.S. 1192 (2001); Bidlack v. Wheelabrator Corp., 993 F.2d 603 (7th Cir.), cert. denied, 510 U.S. 909 (1993).  Thus, none of the cases relied upon by the Union serves to find either that an ambiguity exists in the Memphis Warehouse plan documents or that the retiree benefits vested.

Similarly, the Union has cited several cases for the proposition that "surviving spouse" provisions, i.e., provisions that provide for continued medical insurance coverage for the surviving spouse of a retired employee until the spouse's death, evidence an intent to vest.  See United Rubber, Cork, Linoleum & Plastic Workers v. Pirelli Armstrong Tire Corp., 873 F. Supp. 1093 (M.D. Tenn. 1994); U.A.W. v. Loral Corp., 873 F. Supp. 57

21

(N.D. Ohio 1994), affirmed, 107 F.3d 11 (6th Cir. 1997).  It is
unclear, however, that there is a surviving spouse provision in
any of the plan document associated with the Memphis Warehouse.
Indeed, the only specific provision of a Memphis Warehouse plan
document that the Union has cited to is the provision stating
that coverage for medical expense insurance "will be continued"
after retirement at PPG's expense.  Plaintiff's "Memorandum of
Law," p. 8 (Docket No. 115).  See PPG Exh. 1: 4/1/85 GIP §
10.7(c).

Further, the cases cited by the Union also relied on
the Yard-Man presumption which, as already discussed, the Court
of Appeals for the Third Circuit has specifically rejected.
Skinner, 188 F.3d at 139, 140, 141.  Moreover, as argued by PPG,
there was no language contained in the documents in these cases
that expressly limited the duration of the benefits to the term
of the agreement as exists here.  Thus, these cases do not appear
to provide the basis for departing from Skinner or for finding
that plan documents at issue in this case are ambiguous.

The Union also argues that because the provisions in
the GIPs for Life, Accident and other insurance programs have
specific termination language attached to them, the absence of
termination language in the plan documents with respect to
retiree medical benefits suggests that the latter were intended
to vest.  The termination language in those provisions, however,
as acknowledged by the Union, indicates that coverage is to end
upon retirement and does not serve to limit the duration of

benefits enjoyed during retirement as is at issue here.  <u>See</u>
Union Exh. 30: 1989 Memphis Warehouse GIP.[8]  In this manner, the
fact that the plan documents are devoid of language specifically
pertaining to the termination of retiree medical benefits does
not negate the other durational clauses contained in the relevant
plan documents.  <u>Cf.</u> <u>Skinner</u>, 188 F.3d at 147 ("Silence on
duration ... may not be interpreted as an agreement to vest
retiree benefits in perpetuity.")

Further, the cases relied upon by the Union to support
its position are, as before, <u>Yard-man</u> and <u>United Rubber, Cork,</u>
<u>Linoleum & Plastic Workers v. Pirelli Armstrong Tire Corp.</u>, 873
F. Supp. at 1100, which relied upon <u>Yard-Man</u>.  While these courts
may have found that the inclusion of specific durational
limitations in other provisions of plan documents suggests that
retiree benefits not so limited were intended to vest, they so
found having first accepted the presumption that retiree benefits
were intended to vest.  Proceeding under the opposite presumption
-- that such benefits were not intended to vest -- as we must,
the fact that other provisions may have separate durational
language attached to them does not appear to overcome that
presumption that the GIP limits the provision of medical benefits
provided for therein to the terms of the CBA.  Thus, it does not
appear that either <u>Pirelli</u> or <u>Yard-Man</u> provides the basis for

---

[8]        Again, having merely incorporated its earlier
        filed brief and exhibits, the 1989 Memphis
        Warehouse GIP to which the Union cites appears as
        Exhibit 30 to the Affidavit of John J. Murphy at
        Docket No. 18.

finding an ambiguity or for ignoring <u>Skinner</u>'s requirement that an employer's commitment to vest retiree benefits must be stated in clear and express language in order to overcome the presumption against vesting.

The Union also seeks to distance this case from <u>Skinner</u> by pointing out that in that case the Court declined to find that the "will continue" language was ambiguous since it merely referred back to prior CBAs which, the Union argues, cannot be found here.  Indeed, it appears that in <u>Skinner</u> where a new benefit was being provided the CBA contained language such as "will be obtained" or "will be instituted" and thereafter stated either that the benefit "will continue" or "shall be increased." <u>Skinner</u>, 188 F.3d at 142-43.  Here, because the "will continue" language was included in the first GIP the Union argues that it could not have been referring back to a prior plan document and, thus, an ambiguity exists.  We disagree.

First, as pointed out by PPG, the "first" GIP that the Union relies upon to demonstrate that it, too, contains the "will continue" language, is a GIP pertaining to PPG's plant located in Martinsville, West Virginia, and not the Memphis Warehouse.  <u>See</u> Plaintiff's Brief, pp. 53-4 (C.A. No. 01-1751: Docket No. 44). Moreover, the cited GIP pertains to a CBA PPG negotiated with the ICWUC and not the Steelworkers.  <u>Id.</u>  It therefore appears to have little relevance to the instant motion and cannot provide the basis for finding an ambiguity in the plan documents at issue here.

24

Second, to the extent the "will continue" language appears in the first CBA relevant to the Memphis Warehouse, unlike in Skinner, it does not necessarily follow that an ambiguity exists.  Indeed, the import of Skinner's findings in this regard, as the Union itself has argued, is that the contract must be viewed as a whole and the phrase "will continue" must be read in context rather than in a vacuum.  Here, viewing the GIP as a whole, it is undisputed that it contains a durational clause limiting PPG's obligation with respect to retiree benefits to the term of the CBA.  It would therefore appear that when read in context the "will continue" language can be read only to suggest that benefits will continue for the duration of the CBA.

Indeed, it appears significant that in addressing this issue, the Court in Skinner cites to Senn v. United Dominion Industries, Inc., 951 F.2d 806, 816 (7th Cir. 1992), cert. denied, 509 U.S. 903 (1993), in which the first CBA entered into between the parties also contained "will continue" language in the provisions providing for insurance benefits for retired employees.  Id. at 808.  The Court nevertheless found that "it requires more than a statement in a CBA that welfare benefits 'will continue' to create an ambiguity about vesting, for the logical interpretation under our rule is that benefits 'will continue' for the duration of the contract."  Id. at 816.  Thus, the fact that the first CBA at issue in this case may have contained the "will continue" language appears of little significance and does not create an ambiguity or negate the fact

that under <u>Skinner</u> there must be clear and express language to overcome the presumption against vesting, which is clearly absent here.

In another attempt to convince the Court that an ambiguity exists in this case and that <u>Skinner</u> is somehow distinguishable, the Union points to the fact that <u>Skinner</u>, in part, found that the "will continue" language was unambiguous because it applied to benefits for both active and retired employees and that because benefits for active employees cannot vest, it followed that they did not vest for the retired employees either.  The Union then argues that because the "will continued" language in the GIPs in effect when the Union participants retired in this case only applied to retirees <u>Skinner</u> is somehow inapplicable and compels a finding that an ambiguity exists.

The difficulty with the Union's argument is two fold. First, the only evidence to which the Union cites to support its position that the "will continue" language in this case only applies to retirees does not pertain to the Memphis Warehouse but pertains to PPG's plants located in Martinsville, West Virginia and Circleville, Ohio, which were negotiated by the ICWUC and not the Steelworkers.  <u>See</u> Plaintiff's Brief, p. 54 (C.A. No. 01-1751: Docket No. 44).  What was included or not included in a GIP pertaining to another plant or a CBA negotiated with another union does not appear to be relevant to this motion and cannot

serve to create an ambiguity in the plan documents governing the Memphis Warehouse.

Second, as already discussed, the April 1, 1985 GIP specifically states that the Company will continue benefits for both active and retired employees.  PPG Exh. 1: 4/1/85 GIP, p. 3. While it is unclear whether or not this language is representative of all the GIPs pertaining to the Memphis Warehouse, the Union has not produced evidence to the contrary and, thus, has failed to demonstrated that an ambiguity exists.

Finally, the Union argues that the reservation of rights clause contained in the Memphis Warehouse GIPs is not explicit enough under McCoy v. Meridian Automobile Systems, 390 F.3d 417, 424-25 (6th Cir. 2004) ("McCoy"), to make the benefits terminable and was nevertheless not bargained for.

In McCoy, the defendant/employer, relying on Maurer v. Joy Technologies, Inc., 212 F.3d 907 (6th Cir. 2000) ("Maurer"), argued that the union was precluded from arguing that retirement benefits had vested because the union failed to file a grievance after it distributed a GIP containing a reservation of rights clause allowing the employer to terminate coverage.  The Court rejected the defendant's argument distinguishing between the reservation of rights case in Maurer, which the Court found contained unqualified language that would fairly prompt a union to protest, and the clause in the record before it which the Court found would not.  Specifically, the Court noted that the reservation of rights clause at issue in Maurer retained the

right to curtail or eliminate coverage for any treatment or
procedure at any time regardless of any CBA in effect or any
future collective bargaining negotiations.  In contrast, the
clause at issue in the case before it provided that:

> The Plan may be amended at any time and in
> any manner by [Rockwell/Cambridge].  While
> [Rockwell/Cambridge] intends to continue the
> plan indefinitely, it reserves the right to
> terminate all or part of the Plan at any
> time, and cancel all or part of the coverages
> and benefits under the Plan.  Any such action
> would be taken only after careful
> consideration and subject to the provisions
> of any applicable collective bargaining
> agreement.

McCoy, 390 F.3d at 424.  The Court found that because of the
reference to the CBAs, coupled with language found elsewhere in
the GIPs that refer to termination only "upon discontinuance of
the Collective Bargaining Agreement," "[i]f the Group Benefits
Plan were discontinued" or "subject to the provisions of any
applicable collective bargaining agreement," this clause, unlike
in Maurer, was not so sweeping that it would have compelled union
leaders to protest.  Id. at 425.

Here, the reservation of rights clauses in the Memphis
Warehouse GIPs not only reserve the right to amend, modify or
terminate the plan or any provision contained therein at any
time, they specifically refer to amendments that would affect
retirees as well as active employees including those that would
require contributions as a condition of continued participation
in the plan, adjustments to deductibles, co-insurance, premium
contributions or modifications for continued retiree medical

coverage.  Most important, however, they make no reference to any collective bargaining agreements or any limitations on PPG's right to modify or reduce benefits that may be included therein. See PPG Exh. 3: 4/1/92 GIP, pp. 4, 88.  It therefore appears that the reservation of rights clauses at issue here, unlike in McCoy, are sufficiently broad and specific to have drawn the Union's attention.  Indeed, the Sixth Circuit's holding in Maurer appears more applicable to the instant case and, as previously found with respect to the duration clauses at issue, appears to preclude the union from arguing that retirement benefits had vested in light of its failure to grieve the reservation of rights clause which has been conspicuously contained in the GIPs since 1992.[9]

---

[9]        We decline to alter our findings here based on
           the Union's Notice of New Authority filed on
           September 29, 2005.  Not only is the case upon
           which it relies an unpublished case from the
           District of Arizona but its cursory finding that
           "contrary inferences as to intent are possible"
           on the limited facts developed is of little help.
           ASARCO v. United Steel Workers of America, 2005
           U.S. Dist. LEXIS 20873 *9 (D. Az. July 26, 2005).
           Moreover, to the extent that the Court found the
           language in the CBA ambiguous because it provided
           that benefits "shall continue," it appears
           contrary to the Third Circuit's finding in
           Skinner.  Further, with respect to the
           reservation of rights ("ROR") issue, the CBA in
           that case contained a clause stating that "health
           benefits provided are 'subject to the rules and
           regulations of the Plan not in conflict with [the
           CBA].'" Id. at * 12.  Because the CBA provided
           for what could be vested benefits, the Court
           found that the ROR in the SPDs, which was not
           bargained for, was subordinate to the CBA and
           could not affect what could be contractually
           vested or bargained for rights.  Not only are the
           facts in our case distinguishable with respect to
           language and documents but it does not appear
           that the question of whether the defendants
           acquiesced to the inclusion of the ROR or whether
           they waived their right to object to its
                                            (continued...)

29

It therefore appears that the plan documents pertaining to the Memphis Warehouse are not only devoid of clear and express language indicating PPG's intent to vest retiree welfare benefits, but they are without ambiguity, thereby precluding a finding that PPG intended for retiree medical benefits to vest.[10]

_____

[9]         (...continued)
insertion was addressed by the Court.  Having found that the Union, in fact, waived its right to object to the duration clause at issue here, ASARCO does not appear to compel a different result.

[10]        Having so found, we reiterate here that it is the plan documents that control and which the Court must assess to determine whether the right to lifetime benefits has been established.  Unisys, 58 F.3d at 902.  While we are mindful of the fact that extrinsic evidence may be used to determine whether an ambiguity exists in a plan document, it may not be used to create an ambiguity where none exists.  See Skinner, 188 F.3d at 145.  Indeed, quoting from Bidlack v. Wheelabrator Corp., 993 F.2d at 608, the Court in Skinner opined that before extrinsic evidence should be considered, "there must be either contractual language on which to hang the label of ambiguous or some yawning void ... that cries out for an implied term.  Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them."  Skinner, 188 F.3d at 146.  Because it appears that no ambiguity exists in the plan documents at issue here we have not considered the extrinsic evidence submitted by the Union.  It should nevertheless be noted that the evidence submitted by the Union consists largely of documents other than plan documents and testimony from Union officials that benefits were meant to vest or statements allegedly made to them by PPG representatives to the same effect.  The Court of Appeals for the Third Circuit has held, however, that neither testimonies of union members as to their belief regarding the duration of retirement benefits nor an employer's oral undertakings serve to modify the written terms contained in plan documents that are otherwise complete.  Skinner, 188 F.3d at 145-147.  See Depenbrock v. CIGNA Corp., 389 F.3d 78, 81-82 (3d Cir. 2004)(ERISA requires that all employee benefit plans be established and maintained pursuant to a written instrument and
                                        (continued...)

30

As such, the grievance which the Union seeks to arbitrate cannot be said to arise under the contract and, thus, PPG cannot be compelled to arbitrate under the expired CBAs.  <u>Litton</u>, <u>supra</u>.

For these reasons, it is recommended that defendant's motion for summary judgment pertaining to plaintiff's claims regarding defendant's Memphis, Tennessee warehouse(Docket No. 95) be granted, and that plaintiff's refiled motion for summary judgment (Docket No. 94) be denied.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,


<u>/s/ Amy Reynolds Hay</u>
AMY REYNOLDS HAY
United States Magistrate Judge


Dated:    30 September, 2005.


cc:  Hon. David S. Cercone
     United States District Judge

     Michael J. Healey, Esquire
     Healey & Hornack
     Law & Finance Building, Fifth Floor

---

[10]          (...continued)
          precludes oral or informal amendments.)  It
          therefore appears that even if the Court were to
          consider the Union's extrinsic evidence it would
          not compel a different result.

Pittsburgh, PA 15219

Sally M. Tedrow, Esquire
O'Donoughe & O'Donoughe
4748 Wisconsin Avenue, NW
Washington, DC 20016

Richard J. Antonelli, Esquire
Spilman Thomas & Battle, PLLC
One Oxford Centre, Suite 3440
301 Grant Street
Pittsburgh, PA 15219

Melvin P. Stein, Esquire
United Steel Workers of America
Five Gateway Center
Room 807
Pittsburgh, PA 15222

William T. Payne, Esquire
Schwartz. Steinsapir, Dohrmann & Sommers
1007 Mt. Royal Boulevard
Pittsburgh, PA 15223

John E. Stember, Esquire
Edward J. Feinstein, Esquire
Pamina Ewing, Esquire
Stephen M. Pincus, Esquire
Stember Feinstein Krakoff
429 Forbes Avenue
1705 Allegheny Building
Pittsburgh, PA 15219