IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STEEL WORKERS OF AMERICA AFL-CIO-CLC, a labor organization, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 01-1601 |
| | ) | |
| PPG INDUSTRIES, INC., | ) | Judge Cercone |
| | ) | Magistrate Judge Hay |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

I.   RECOMMENDATION

It is respectfully recommended that defendant's motion for summary judgment pertaining to plaintiff's claims regarding defendant's Fresno, California Plant (Docket No. 98) be granted, and that plaintiff's refiled motion for summary judgment (Docket No. 94) be denied.

II.   REPORT

Presently before this Court for disposition are cross-motions for summary judgment brought by the parties with respect to the allegations in the complaint pertaining to PPG's Fresno, California Plant ("the Fresno Plant").

Plaintiff, United Steelworkers of America, AFL-CIO-CLC ("the Steelworkers" or "the Union"), commenced this action against defendant PPG Industries, Inc. ("PPG") under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, after PPG notified retirees from, inter alia, the Fresno Plant in

January of 2001 that it was modifying their medical benefits.[1]
The Union alleges that PPG has reneged on its agreement not to
reduce or terminate medical benefits for retirees and that PPG's
refusal to accept and/or arbitrate the Steelworker's grievance in
this regard violates its contractual obligations under the
relevant Collective Bargaining Agreements ("CBAs").

Cross-motions for summary judgment have now been filed
in which the Union argues that under the broad arbitration
clauses contained in the relevant CBAs PPG is obligated to
arbitrate the issue of whether the benefits at issue vested and
that this Court need only inquire into whether the benefits here
are the type that could vest before compelling PPG to do so.  As
well, the Union contends that it has provided sufficient evidence
to support a finding that the benefits were meant to vest so as

---

[1]     As the Court is probably aware, the Union has
also alleged in this case that PPG has violated
the terms of Collective Bargaining Agreements
governing employment at various other PPG plants.
Because of the nuances in the various documents
associated with each plant, PPG has filed
separate motions as to the Fresno Plant, the
Memphis Plant, the Springdale Plant and Glass
Plants other than the Fresno Plant, which will be
dealt with in separate Report and
Recommendations.  It should also be noted that
there are two related cases to this one in which
unions other than the Steelworkers have brought
similar allegations against PPG for violating
various CBAs negotiated by those unions on behalf
of PPG employees at other plants.  See
International Chemical Worker's Union Council of
the United Food and Commercial Workers Union and
its Locals 45C and 776C v. PPG Industries, Inc.,
C.A. No. 01-1751 and Local Lodge 470 of District
161, International Association of Machinists and
Aerospace Workers v. PPG Industries, Inc., C.A.
No. 01-2110.  A different set of motions has been
filed in each of these cases which will also be
addressed separately.

to survive summary judgment.[2]  PPG, on the other hand, has taken
the position that the instant dispute revolves around insurance
benefits which, under the pre-1993 CBAs, were exempted from
arbitration and that it nevertheless has no duty to arbitrate
because the benefits at issue had not vested while the relevant
CBAs were in effect.

Summary judgment is appropriate if, drawing all
inferences in favor of the non-moving party, "the pleadings,
depositions, answers to interrogatories and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R.Civ. P.
56(c).  Summary judgment may be granted against a party who fails
to adduce facts sufficient to establish the existence of any

---

[2]     We note here that after the original motions for
summary judgment were withdrawn, the Court
requested that each party wishing to renew its
motion after discovery was completed resubmit a
completely new motion at the appropriate civil
action number so that the record in each case
would be self contained and so that the Court
would not have to go on a fishing expedition to
retrieve the documents needed to resolve each
motion.  The Union for some reason was unable to
abide by this request and has simply filed a
notice that it is reinstating the earlier motion,
supporting brief and part of the exhibits filed
in this case in April of 2002, on behalf of the
plaintiffs in all three cases.  See Docket Nos.
13-22, 114.  As well, rather than file its own
comprehensive brief in response to PPG's motions
in this case, the Union has submitted a document
in which it merely recites provisions of plan
documents, see Docket No. 115, and incorporates
the brief filed by the International Chemical
Workers Union Council of the United Food and
Chemical Workers Union ("ICWUC") in another case.
Thus, the Union's brief submitted in response to
PPG's motion here appears as Docket No. 44 in
Civil Action No. 01-1751.

element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial* ... or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Thus, it must be determined "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

PPG initially argues that any claim brought by the Union arising under a pre-1993 CBA is not arbitrable since each of the CBAs in effect prior to the May 16, 1993 agreement contained a provision which expressly exempted from the grievance and arbitration procedure claims for insurance benefits. PPG points to the May 16, 1972 CBA, which purports to be the first agreement containing the exemption clause, and specifically to

4

§36.1 as being representative of such clauses in all the pre-1993

CBAs.  Section 36.1 provides that:

> The final determination of whether an insured
> employee qualified for claim payments under
> sections 32, 33, 34 or 35 will be made by the
> Equitable Life Assurance Society of the
> United States or any other applicable
> insurance carrier.  Such determinations may
> not be made the subject of a complaint under
> Section 7 – COMPLAINT PROCEDURE and is not a
> proper matter for arbitration under Section
> 8.

PPG Exhibit 2: 5/16/72 CBA § 36.1.[3]  See PPG Exhibit 19: Bono

Aff. ¶¶ 16, 17.  PPG submits that because the substance of the

grievance that the Union wishes to arbitrate is whether retirees

from the Fresno Plant are entitled to payments under the

insurance program applicable to them at the time of retirement,

it is exempt from arbitration under § 36.1.

Although the Union has not responded to PPG's argument

in this regard, review of the provision cited by PPG does not

appear to be as broad as PPG would have us find nor is the

grievance that the Steelworkers seek to arbitrate quite so

narrow.  Indeed, the issue in this case is not merely whether an

insured employee who has submitted a claim for insurance

qualifies for those benefits under the terms of the CBA, but,

rather, it is whether PPG's proposed reduction of the benefits to

which the employee would otherwise be entitled infringes on a

right that has vested or accrued.  While the question of whether

an insurance claim is covered under a particular agreement may be

_____

[3]          Unless otherwise indicated, all of the exhibits
             submitted by PPG appear at Docket No. 100.

exempt from arbitration under the pre-1993 CBAs and appropriately resolved by the insurance carrier, it does not appear that whether or not PPG has properly reduced the benefits to which an employee may be entitled falls under the same category.  Nor does it appear that the issue is one that the parties would have resolved by the insurance company.  Thus, it does not appear that § 36.1 applies to the present dispute and does not provide the basis for finding that the Union's claims are not arbitrable.

PPG next submits that the remaining issue before the Court is whether or not the benefits at issue vested or accrued which, in turn, will dictate whether it should be compelled to arbitrate the instant dispute.  The Union counters arguing that the question of whether the benefits are vested goes to the merits of the dispute and is properly decided in arbitration and that in order to compel arbitration the Court need only determine that the claim at issue is the type that could be vested.  This Court, however, has already rejected the Union's position in this regard and has determined that before arbitration may be compelled, the Court must first decide whether the rights at issue, in fact, vested or accrued.

Indeed, review of the record shows that while the Union's original motion for summary judgment was pending, PPG filed a motion to compel discovery arguing that it needed discovery in order to challenge the Union's position posited in its motion that the benefits at issue vested under the relevant CBAs.  PPG's position was that because at least some of the

6

agreements at issue had expired prior to the decision to reduce benefits, the arbitration provisions contained in those agreements were inapplicable.  Magistrate Judge Benson, who was then presiding over the pretrial matters in this case, was therefore put in the position of having to determine what discovery, if any, was appropriate under Rule 26(b)(1), while mindful of the Court's limited authority to decide the underlying issues involved in a suit to compel arbitration.

In resolving the issue, Magistrate Judge Benson relied principally on Litton Financial Printing Division v. NLRB, 501 U.S. 190 (1991)("Litton"), which, like the instant case, involved whether disputes arising under an expired CBA are subject to the arbitration provision contained therein.  The Litton Court held that the presumption previously announced by the Supreme Court in Nolde Brothers, Inc. v. Bakery Workers, 430 U.S. 243 (1977)("Nolde"), that the duty to arbitrate disputes arising under an agreement outlasts the date of expiration, only applies to "disputes arising under the contract."  The Court went on to find that "postexpiration grievances can be said to arise under a contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement."  Litton, 501 U.S. at 205-06.  Magistrate Judge Benson recognized, as other courts have, that despite the fact

that the Litton Court expressly declined to overrule Nolde, the two decisions were incongruous.  Memorandum Order, Benson, M.J. (August 2, 2002) (Docket No. 37).

In an effort to resolve the apparent "tension" between Litton and Nolde, Magistrate Judge Benson took instruction from Luden's Inc. v. Local Union No. 6, 28 F.3d 347 (3d Cir. 1994)("Luden"), in which the Court of Appeals for the Third Circuit noted, albeit in dicta, that Litton held that "a court has the *duty* to reach the merits of the claim, and can order arbitration only if it concludes that the lapsed CBA in fact creates the right or obligation at issue."  Memorandum Order, p. 6, quoting Luden, 28 F.3d at 353-54 (emphasis in original). Opining that the rule set forth in Litton was the Supreme Court's latest and unequivocal statement of the law, Magistrate Judge Benson applied Litton's holding to the instant case and held that: "In this case, where post-expiration conduct is alleged to have violated a right that accrued or vested during the term of a now-expired collectively bargained agreement, the court must make inquiry into whether the right at issue actually vested or accrued while the contract was in force."  Memorandum Order, p. 7.

It therefore appears, contrary to the Union's assertion, that Magistrate Judge Benson has already determined that the Court must decide whether the benefits at issue vested or accrued prior to the expiration of the relevant CBAs which, in turn, will dictate whether the case should be subject to

8

arbitration.  Because the district court subsequently denied the Unions' objections to Magistrate Judge Benson's Memorandum Order it now appears to be the law of the case.  See Order of Court, Ziegler, J. (October 18, 2002)(Docket No. 46).  See also In re City of Philadelphia Litigation, 158 F.3d 711, 718 (3d Cir. 1998)(Finding that absent extraordinary circumstances such as the availability of new evidence, a supervening new law or where the earlier decision was clearly erroneous, the law of the case doctrine precludes the reconsideration of previously decided issues.)

The Union nevertheless makes much of Magistrate Judge Benson's language that the Court only has to "make inquiry" into whether the right at issue actually vested or accrued, arguing that "making an inquiry" into whether the right vested is somehow distinct from actually determining whether the right vested and only requires the Court determine if it is the type of claim that could be vested.  We disagree.

Not only has Magistrate Judge Benson already rejected the Union's position that merely having an arguable basis for asserting that the right to retiree welfare benefits vested under the contract is sufficient to compel arbitration, see Memorandum Order, p. 5, but the Union appears to ignore the rest of the Magistrate's Memorandum Order which, when read as a whole, clearly indicates that the Court is required to determine whether or not the benefits at issue here vested before it can determine whether the Union's claims are subject to the relevant

arbitration provisions.  As already discussed, the holding in
Litton, as quoted by Magistrate Judge Benson, states that a post-
expiration grievance can be said to arise under a contract,
thereby giving rise to the presumption of arbitrability, only
where, inter alia, "an action taken after expiration infringes on
a right that accrued or vested under the agreement."  Id. at 3.
It does not say that the presumption applies where the claim at
issue is merely the type of claim that could be vested.  Further,
Magistrate Judge Benson specifically stated that the issue in
Litton was "whether the contractual right at issue 'vested or
accrued' while the CBA was in effect."  Id.  He did not interpret
the issue as being whether the contractual right at issue was the
type that could be vested or accrued.  Indeed, contrary to the
Union's suggestion, the Litton majority did not merely find that
the right to have seniority considered in making layoffs was not
the type of claim that could be vested but, as noted by
Magistrate Judge Benson, it found that the right had, in fact,
not vested or accrued prior to the expiration of the contract.
Id. at 4.

Moreover, as the Union appears to acknowledge,
Magistrate Judge Benson clearly relied on the Third Circuit's
findings in Luden, which describes Litton as holding that "a
court has the *duty* to reach the merits of the claim, and can
order arbitration only if it concludes that the lapsed CBA in
fact creates the right or obligation at issue."  Id. at 6.  The
Luden Court did not find, nor did Magistrate Judge Benson, that

<u>Litton</u> stood for the proposition that the Court is precluded from reaching the merits of the underlying dispute or that the Court need only determine if the claim is the type that could be vested.

Finally, following Magistrate Judge Benson's statement that "the Court must 'make inquiry' into whether the right at issue actually vested or accrued while the contract was in force," he described his findings as requiring the court to address the merits of the issue.[4]  Under these circumstances, the Union's position that neither <u>Litton</u> nor Magistrate Judge Benson's Memorandum Order requires the court to address the merits of the dispute or to determine whether the benefits at issue here actually vested is not only without merit but is contrary to the law of the case.

As such, we turn to the issue of whether the benefits at issue in this case vested.

As a preliminary matter, we note that the Union has argued that, rather than follow Third Circuit precedent in deciding this issue, the Court should apply precedent as set forth by arbitrators who have decided vesting disputes because the parties in this case "bargained for ... a determination by an

---

[4]        Specifically, Magistrate Judge Benson stated that, "To say, however, that in this case the court must address the merits of the issue, and, hence, that the parties are permitted to conduct discovery, is not to answer the precise question before the court: exactly <u>what</u> discovery is proper?"  Memorandum Order, p. 7.

arbitrator." Plaintiff's Brief at p. 36 (C.A. No. 01-1751: Docket No. 44). Of course, the difficulty with the Union's argument, aside from the fact that it has offered no authority to support its position, is that it remains to be seen whether the parties bargained for this particular dispute to be arbitrated. Whether or not the parties agreed to arbitrate is a determination that is properly made by the Court and, under Third Circuit precedent, requires the Court -- not an arbitrator -- to decide whether the benefits at issue vested. <u>Litton</u>, <u>supra</u>. The fact that the Court may simultaneously resolve the issue that the Union seeks to arbitrate does not appear to be avoidable and nevertheless does not provide the basis for ignoring the law of the this circuit.

Indeed, in <u>Litton</u>, the Supreme Court expressly recognized that it could not avoid the duty of determining whether the parties agreed to arbitrate a post-expiration dispute simply because that determination would require it to interpret the language of a bargaining agreement, a responsibility typically within the purview of the arbitrator. <u>Id.</u> at 209. In fact, the Court proceeded to do just that when, in order to determine whether the dispute over layoffs was arbitrable, it found that the right at issue in that case had not vested during the term of the Agreement. <u>Id.</u> at 209-210. Because the issue here, like in <u>Litton</u>, is whether the parties agreed to arbitrate in the first instance, it is an issue properly resolved by the Court under the precedent binding on this Court.

12

We therefore turn to the Third Circuit's opinion in
International Union, United Authomobiule, Aerospace &
Agricultural Implement Workers of America v. Skinner Engine Co.,
188 F.3d 130 (3d Cir. 1999)("Skinner"), which appears to govern
the instant dispute.

As found by the Court in Skinner, ERISA recognizes two
types of employee benefit plans: employee welfare plans, which
are at issue here, and employee pension plans.  Id. at 137.
Although pension plans have elaborate vesting requirements under
ERISA, it does not require automatic vesting of welfare benefit
plans.  Id.  As the Third Circuit has explained, the difference
was not accidental, but, rather, a recognition by Congress that
employers need some flexibility regarding their right to alter
medical plans due to the fact that the "'costs of such plans are
subject to fluctuating and unpredictable variables'" such as
"'inflation, changes in medical practice and technology, and
increases in the cost of treatment independent of inflation.'"
Id. at 138, quoting Moore v. Metropolitan Life Ins. Co., 856 F.2d
488, 492 (2d Cir. 1988).

It is undisputed, however, that "in some situations, a
welfare plan may provide a vested benefit."  In Re Unisys Corp.
Retiree Medical Benefit "ERISA" Litigation, 58 F.3d 896, 902 (3d
Cir. 1995)("Unisys").  See Skinner, 188 F.3d at 138.  It is the
plan participant's burden to prove, by a preponderance of the
evidence, that the employer intended the welfare benefits to vest

13

for life.  Id. at 138-39.  The Court of Appeals for the Third
Circuit, however, has cautioned that:

> to vest benefits is to render them forever
> unalterable.  Because vesting of welfare
> benefit plans constitutes an extra-ERISA
> commitment, an employer's commitment to vest
> such benefits is not to be inferred lightly
> and must be stated in clear and express
> language.
>
>          *        *        *
>
> These cautionary principles apply without
> regard as to whether the employee welfare
> benefits are provided under a collective
> bargaining agreement, SPD [summary plan
> description], or other plan document; the
> same underlying considerations are present
> irrespective of the particular type of
> document at issue.

Id. at 139.  See Unisys, 58 F.3d at 902 ("[A]ny retiree's right
to a lifetime medical benefit under a plan can only be found if
established by the terms of the ERISA-governed employee benefit
plan .... A court must examine the plan documents.")

It also appears undisputed that while collective
bargaining agreements are generally governed by federal law,
traditional rules of contract construction apply when not
inconsistent with federal labor law.  See Skinner, 188 F.3d at
138.  Moreover, how a plan document or CBA should be interpreted
is typically a question of law and where a CBA is clear and
unambiguous, its meaning must be determined as a matter of law.
Id.

In the instant case, it appears undisputed that until
1972, welfare benefits for the Fresno Plant retirees were
provided for solely in the CBAs.  At that time, and until the

14

1996 CBA was negotiated, certain benefits continued to be provided for in the CBAs while others were set forth in a separate plan booklet entitled Group Insurance Plan or Group Benefits Plan ("GIP") which was then incorporated into the CBAs.[5] Union Exhibit 5: Murphy Aff. ¶¶ 8-10;[6] PPG Exhibit 19: Bono Aff. ¶¶ 7, 10-11.  See PPG Exhibit 2: 5/16/72 CBA, § 34.1.  Although the GIPs were drafted by PPG, it appears that they were subsequently submitted to the Union for review.  PPG Exhibit 1: Murphy Depo., p. 125 (Docket No. 119).  Beginning in 1999, however, it appears that all insurance benefits are provided for in the GIPs which continue to be incorporated into the CBAs. Union Exhibit 5: Murphy Aff. ¶ 8; PPG Exhibit 19: Bono Aff. ¶ 12. It therefore appears that the CBAs negotiated prior to 1999 and the GIPs in effect after 1972 constitute the plan documents at issue here and to which the Court must look to determine whether retiree benefits were intended to vest.

PPG argues that there is not only no clear and express language in any of the plan documents governing the Fresno Plant which would indicate a commitment by PPG to vest retiree medical benefits but that the language that is contained in the documents expressly limits PPG's obligation in this respect for the duration of the CBA.  Specifically, PPG points to the April 22,

---

[5]     GIPs are also referred to as Summary Plan Descriptions ("SPDs"), which is the moniker used by the Union.  Because the booklets describing the benefits in this case are called Group Insurance Plans we have referred to them as GIPs.

[6]     Unless otherwise indicated all of the Union's Exhibits appear at Docket No. 116.

1968 CBA, which appears to be the first CBA negotiated between the parties, and provides that:

> It is understood and agreed that no rights, privileges, duties or obligations provided for in this Agreement shall extend beyond the terms of this Agreement.

PPG Exhibit 1: 4/22/68 CBA, § 38.3.  <u>See</u> PPG Exhibit 19: Bono Aff. ¶¶ 5, 18.  The term of the Agreement is set forth in § 38.1, which is entitled "Duration of Agreement" and provides that:

> This Agreement shall become effective April 22, 1968, and shall continue in full force and effect until 12:01 A.M. on April 22, 1971, and from year to year.

PPG Exhibit 1: 4/22/68 CBA, § 38.1.  <u>See</u> PPG Exhibit 19: Bono Aff. ¶ 21.  Further, PPG has represented, and the Union does not dispute, that both of these provisions are contained in each of the succeeding CBAs to the present.  <u>See</u> PPG Exhibit 19: Bono Aff. ¶¶ 19, 22.

Moreover, PPG has provided evidence that since 1984, each of the GIPs also contains language that its obligation to provide retiree medical benefits was limited to the duration of the CBA then in effect.  Indeed, the May 16, 1984 GIP provides that:

> The Company will continue the benefits described herein for active and retired employees consistent with the terms and conditions of the labor agreement for the duration of such agreement....  In the event of termination of the labor agreement, you have the same rights as to claim submission and review and conversion rights as you would have under individual termination of coverage.

PPG Exhibit 6: 5/16/1984 GIP, p. 5.  <u>See</u> PPG Exhibit 19: Bono
Aff. ¶ 25.  Under these terms, PPG submits, it maintained the
right to modify or terminate such benefits following the
expiration of the CBA.

The Union does not dispute that these provisions are
contained in the relevant plan documents pertaining to the Fresno
Plant, nor does it point to any clear and express language in the
plan documents which would suggest that PPG intended for retiree
medical benefits to vest.  Rather, the Union contends that it did
not bargain for the duration clauses set forth in the GIPs and
that, nevertheless, only the benefit terms were incorporated into
the CBAs and not the duration clauses.

The Union, however, has not provided any support for
its position that PPG unilaterally inserted the duration clause
in the GIPs or that it was unaware of the fact that they had been
included, but instead asks the Court to infer as much from the
fact that the clause began appearing in the GIPs somewhere
between 1984 and 1987 and that it subsequently became an issue in
1993 after PPG first indicated that a modification in benefits
might be forthcoming.[7]

---

[7]         Indeed, we note here that because the Union has
        merely incorporated the brief filed in opposition
        to PPG's motion for summary judgment at Civil
        Action No. 01-1751, most of the evidence cited by
        the Union relates to negotiations involving the
        ICWUC, and not the Steelworkers, and plan
        proposals pertaining to plants other than the
        Fresno Plant and, thus, cannot provide the basis
        for finding a material issue exists in this case.

Even if it were true, however, that PPG surreptitiously inserted the language in the GIP, it is undisputed that the language has been included in every GIP since 1984 and that the Union reviewed each GIP prior to its publication.  Indeed, Mr. Murphy, formerly a union officer with the Union's predecessor who negotiated labor agreements with PPG, testified at his deposition that the Union had the opportunity to review each GIP and that if there were any mistakes or misstatements contained therein the Union would have an opportunity to call that to PPG's attention. PPG Exhibit: Murphy Depo. p. 125 (Docket No. 119).[8]  Under these circumstances, it appears unreasonable to infer that the Union was somehow unaware of the durational clause until 1993 when PPG decided to make changes in retiree medical benefits.  See Maurer v. Joy Technologies, Inc., 212 F.3d 907, 919 (6th Cir. 2000) (Finding that the union was precluded from arguing that the plaintiffs' retirement benefits vested in light of the reservation of rights clause that, while unilaterally inserted by the company, was conspicuously contained in the insurance booklet and remained uncontested for three years.)

Nor do we find persuasive the Union's argument that, notwithstanding whether it was aware of the duration clause, it was not included in the portion of the GIP that was incorporated

---

[8]     Although the Union has referred the Court to a letter from the Union's Roy Albert to Herman Bono at PPG for the proposition that the Union only reviewed the changes made to the GIPs and not the entire document, the letter is devoid of any language to that effect.  See Union Exh. 6: 6/12/93 Letter.

18

into the CBA.  To support its position, the Union cites to the 1996 Creighton, Pennsylvania CBA, which provides that: "A copy of [the GIP] shall be provided to each plan participant and which, so far as benefits are concerned, is incorporated by reference as part of this Agreement."  <u>See</u> Union Exh. 5: Murphy Aff. ¶ 8.  The Union then asserts based on this provision that the only items being incorporated are the benefits themselves and not the duration clause.  We disagree.

First, it appears from this provision that the CBA incorporated anything that "concerned" benefits.  Certainly, a provision governing the duration of those benefits would appear to fall under that category.  Second, not only has Mr. Murphy attested to the fact that the booklets themselves, which fully described the benefits contained therein, were incorporated into the CBA's and not merely the benefit terms, PPG Exh. 13: Murphy Aff. ¶ 8, but, as argued by PPG, the fact that the duration clause became a "stumbling block" in the 1996 negotiations because the Union wanted the language removed appears to suggests that the Union considered it to be part of the agreement in the first instance.

Finally, notwithstanding whether the duration clauses contained in the GIPs were incorporated into the CBAs, it is undisputed that the CBAs themselves contain a clause limiting the duration of benefits.  As previously discussed, each CBA since 1968 states that, "It is understood and agreed that no rights, privileges, duties or obligations provided for in this Agreement

19

shall extend beyond the terms of this Agreement."  See PPG
Exhibit 1: 4/22/68 CBA, § 38.3.  Thus, it appears, rather than
contain clear and express language which would demonstrate that
PPG intended the retiree medical benefits to vest, the plan
documents contain language indicating just the opposite.

        The Union nevertheless argues that the plan documents,
and in particular the language contained in the GIPs stating that
PPG "will continue" the benefits at issue, are ambiguous, thereby
requiring the Court to look beyond the plan documents themselves
to decide the vesting issue.

        The Court of Appeals for the Third Circuit, however,
has specifically rejected the notion that under these
circumstances the phrase "will continue" included in provisions
providing medical benefits is ambiguous.  To the contrary, in
assessing a series of CBAs containing the same "will continue"
language at issue here, the Third Circuit found that:

> It cannot be said that the phrases clearly
> and expressly indicate vesting since there is
> simply no durational language to qualify
> these phrases.  That is, the CBAs do not
> state that retiree benefits "will continue
> for the life of the retiree," or that they
> "shall remain unalterable for the life of the
> retiree."  An equally reasonable
> interpretation is that the benefits "will
> continue until the CBA expires," or that they
> "shall remain ... until the CBA expires."
> Indeed, the latter interpretation appears to
> be the more reasonable in light of the
> durational provisions in all of the CBAs.
> Section 46 of the 1986-1989 CBA is
> illustrative: "This Agreement represents a
> complete resolution of all non economic items
> and shall, in all of its terms, remain in
> effect from July 1, 1986 until midnight, June
> 30, 1989 ...."  Read in conjunction with the

> durational clauses, the phrases could be
> interpreted to mean, for instance, that the
> medical benefits "will continue until
> midnight of June 30, 1989."
>
> \*          \*          \*
>
> The phrases, "will continue" and "shall
> remain," as discussed above, are simply not
> susceptible to more than one reasonable
> interpretation, and they do not somehow
> render the CBA's incomplete or ambiguous.

Skinner, 188 F.3d at 141, 146.

The Union nevertheless attempts to distinguish this case from Skinner and argues that the differences require a finding that the "will continue" language found in the instant case is ambiguous.

The Union first contends that because other courts have reviewed language similar to the "will continue" language at issue here and have determined that such language is ambiguous or vests in favor of retirees this Court should as well.  In so arguing, the Union relies on a series of cases from the Court of Appeals for the Fourth and Sixth Circuits that have followed the Sixth Circuit's holding in International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1983), 465 U.S. 1007 (1984)("Yard-Man"), in which it was found that such "will continue" language creates a presumption that the parties intended retiree welfare benefits to continue for life.  See U.A.W. v. BVR Liquidating, Inc., 190 F.3d 768 (6th Cir. 1999), cert. denied, 529 U.S. 1067 (2000); Keffer v. H.K. Porter Co., 872 F.2d 60 (4th Cir. 1989); Smith v. ABS Industries, Inc., 890

F.2d 841, 847 (6th Cir. 1989).  As acknowledged by the Union
elsewhere in its brief, however, the Court of Appeals for the
Third Circuit in <u>Skinner</u> specifically, and repeatedly, declined
to adopt what has been termed the "<u>Yard-Man</u> presumption" or <u>Yard-</u>
<u>Man</u>'s interpretation of the relevant contract language.  <u>Skinner</u>,
188 F.3d at 139, 140, 141.  In fact, the Third Circuit
subsequently described its opinion in <u>Skinner</u> as creating a
presumption against vesting with respect to welfare benefit
plans.  <u>Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc.</u>
<u>Employee Health and Welfare Plan</u>, 298 F.3d 191, 196 (3d Cir.
2002).  Thus, it appears that the Union's reliance on <u>Yard-Man</u>
and its progeny is misplaced.

        Nor do the remaining cases cited by the Union compel a
different result as the plan documents in those cases, unlike in
this case, did not contain any clauses limiting the duration of
benefits or the terms of the agreement.  <u>See</u> <u>Rossetto v. Pabst</u>
<u>Brewing Co.</u>, 217 F.3d 539 (7th Cir. 2000), <u>cert.</u> <u>denied</u>, 531 U.S.
1192 (2001); <u>Bidlack v. Wheelabrator Corp.</u>, 993 F.2d 603 (7th
Cir.), <u>cert.</u> <u>denied</u>, 510 U.S. 909 (1993).  Thus, none of the
cases relied upon by the Union serves to find either that an
ambiguity exists in the Fresno plan documents or that the retiree
benefits vested.

        Similarly, the Union has cited several cases for the
proposition that "surviving spouse" provisions, <u>i.e.</u>, provisions
that provide for continued medical insurance coverage for the
surviving spouse of a retired employee until the spouse's death,

evidence an intent to vest.  See United Rubber, Cork, Linoleum & Plastic Workers v. Pirelli Armstrong Tire Corp., 873 F. Supp. 1093 (M.D. Tenn. 1994); U.A.W. v. Loral Corp., 873 F. Supp. 57 (N.D. Ohio 1994), affirmed, 107 F.3d 11 (6th Cir. 1997).  These cases, however, also relied on the Yard-Man presumption which, as already discussed, the Court of Appeals for the Third Circuit has specifically rejected.  Skinner, 188 F.3d at 139, 140, 141. Moreover, as argued by PPG, there was no language contained in the documents in these cases that expressly limited the duration of the benefits to the term of the agreement as exists here. Thus, these cases do not appear to provide the basis for departing from Skinner or for finding that plan documents at issue in this case are ambiguous.

The Union also argues that because the provisions in the GIPs for Life, Accident and other insurance programs have specific termination language attached to them that the absence of termination language in the plan documents with respect to retiree medical benefits suggests that the latter were intended to vest.  The termination language in those provisions, however, as acknowledged by the Union, indicates that coverage is to end upon retirement and does not serve to limit the duration of benefits enjoyed during retirement as is at issue here.  See Union Exh. 97: 1984 Fresno Plant GIP.[9]  In this manner, the fact

---

[9]     Again, having merely incorporated its earlier filed brief and exhibits, the 1984 Fresno Plant GIP to which the Union cites appears as Exhibit 97 to the Affidavit of John J. Murphy at Docket No. 22.

that the plan documents are devoid of language specifically pertaining to the termination of retiree medical benefits does not negate the other durational clauses contained in the relevant CBAs, particularly that which provides that "no rights, privileges, duties or obligations provided for in this Agreement shall extend beyond the terms of this Agreement."  PPG Exhibit 1: 4/22/68 CBA, § 38.3.  Cf. Skinner, 188 F.3d at 147 ("Silence on duration ... may not be interpreted as an agreement to vest retiree benefits in perpetuity.")

        Further, the cases relied upon by the Union to support its position are, as before, Yard-man and United Rubber, Cork, Linoleum & Plastic Workers v. Pirelli Armstrong Tire Corp., 873 F. Supp. at 1100, which relied upon Yard-Man.  While these courts may have found that the inclusion of specific durational limitations in other provisions of plan documents suggests that retiree benefits not so limited were intended to vest, they so found having first accepted the presumption that retiree benefits were intended to vest.  Proceeding under the opposite presumption -- that such benefits were not intended to vest -- as we must, the fact that other provisions may have separate durational language attached to them does not appear to overcome that presumption that the CBA limits the provision of all rights privileges, duties or obligations provided for therein to the terms of the CBA.  Thus, it does not appear that either Pirelli or Yard-Man provides the basis for finding an ambiguity or for ignoring Skinner's requirement that an employer's commitment to

vest retiree benefits must be stated in clear and express language in order to overcome the presumption against vesting.

The Union also seeks to distance this case from Skinner by pointing out that in that case the Court declined to find that the "will continue" language was ambiguous since it merely referred back to prior CBAs which, the Union argues, cannot be found here.  Indeed, it appears that in Skinner where a new benefit was being provided the CBA contained language such as "will be obtained" or "will be instituted" and thereafter stated either that the benefit "will continue" or "shall be increased." Skinner, 188 F.3d at 142-43.  Here, because the "will continue" language was included in the first GIP the Union argues that it could not have been referring back to a prior CBA and, thus, an ambiguity exists.  We disagree.

First, as pointed out by PPG, the "first" GIP that the Union relies upon to demonstrate that it, too, contains the "will continue" language, is a GIP pertaining to PPG's plant located in Martinsville, West Virginia, and not the Fresno Plant.  See Plaintiff's Brief, pp. 53-4 (C.A. No. 01-1751: Docket No. 44). Moreover, the cited GIP pertains to a CBA PPG negotiated with the ICWUC and not the Steelworkers.  Id.  It therefore appears to have little relevance to the instant motion and cannot provide the basis for finding an ambiguity in the plan documents at issue here.[10]

---

[10]    We note here that PPG also argues that, contrary to the Union's representation, the facts of this case are identical to Skinner because the "will

(continued...)

Second, even if the "will continue" language appears in the first CBA relevant to the Fresno Plant, unlike in Skinner, it does not necessarily follow that an ambiguity exists.  Indeed, the import of Skinner's findings in this regard, as the Union itself has argued, is that the contract must be viewed as a whole and the phrase "will continue" must be read in context rather than in a vacuum.  Here, viewing the CBA as a whole, it is undisputed that it contains a durational clause limiting PPG's obligation with respect to retiree benefits to the term of the contract.  It would therefore appear that when read in context the "will continue" language can be read only to suggest that benefits will continue for the duration of the CBA.

Indeed, it appears significant that in addressing this issue, the Court in Skinner cites to Senn v. United Dominion Industries, Inc., 951 F.2d 806, 816 (7th Cir. 1992), cert. denied, 509 U.S. 903 (1993), in which the first CBA entered into between the parties also contained "will continue" language in the provisions providing for insurance benefits for retired employees.  Id. at 808.  The Court nevertheless found that "it requires more than a statement in a CBA that welfare benefits

_____

[10]            (...continued)
continue" language is absent from the first CBA here as well.  It is unclear, however, whether the CBA to which PPG points the Court pertains to the Fresno Plant, as it has been submitted in conjunction with PPG's motion pertaining to all PPG Glass plants other than the Fresno Plant. See PPG Exhibit 1: Big Glass CBA, p. 91 (Docket No. 103).  Notably, neither party appears to have submitted the relevant portion of the April 22, 1968 CBA pertaining to the Fresno Plant.

'will continue' to create an ambiguity about vesting, for the logical interpretation under our rule is that benefits 'will continue' for the duration of the contract." <u>Id.</u> at 816.  Thus, the fact that the first CBA at issue in this case may have contained the "will continue" language appears of little significance and does not create an ambiguity or negate the fact that under <u>Skinner</u> there must be clear and express language to overcome the presumption against vesting, which is clearly absent here.

In another attempt to convince the Court that an ambiguity exists in this case and that <u>Skinner</u> is somehow distinguishable, the Union points to the fact that <u>Skinner</u>, in part, found that the "will continue" language was unambiguous because it applied to benefits for both active and retired employees and that because benefits for active employees cannot vest, it followed that they did not vest for the retired employees either.  The Union then argues that because the "will continued" language in the GIPs in effect when the Union participants retired in this case only applied to retirees <u>Skinner</u> is somehow inapplicable and compels a finding that an ambiguity exists.

The difficulty with the Union's argument is two fold. First, the only evidence to which the Union cites to support its position that the "will continue" language in this case only applies to retirees does not pertain to the Fresno Plant but pertains to PPG's plants located in Martinsville, West Virginia

27

and Circleville, Ohio, which were negotiated by the ICWUC and not
the Steelworkers.  See Plaintiff's Brief, p. 54 (C.A. No. 01-
1751: Docket No. 44).  What was included or not included in a GIP
pertaining to another plant or a CBA negotiated with another
union does not appear to be relevant to this motion and cannot
serve to create an ambiguity in the plan documents governing the
Fresno Plant.

        Second, as already discussed, the May 16, 1984 GIP
specifically states that the Company will continue benefits for
both active and retired employees.  PPG Exhibit 6: 5/16/84 GIP,
p. 5.  While it is unclear whether or not this language is
representative of all the GIPs pertaining to the Fresno Plant,
the Union has not produced evidence to the contrary and, thus,
has failed to demonstrated that an ambiguity exists.

        Finally, the Union argues that an ambiguity in the plan
documents exists as evidenced by the fact that PPG failed to
include a "reservation of rights" provision in any of the GIPs,
except for that pertaining to the Memphis Plant.  Having included
a reservation of rights clause in the Memphis GIP, the Union
appears to suggest that PPG's deliberate omission of one in the
Fresno GIPs somehow nullifies the duration clause.  The Union,
however, has cited no authority for its position or any that
would support a finding that a reservation of rights clause must
be included in order to express the intent that benefits were not
to vest.  Perhaps the Union has not done so in light of Skinner,
which demonstrates that under the law of this circuit a duration

clause alone can effectively minimize an employer's obligation to provide retiree welfare benefits.

Moreover, as argued by PPG, a reservation of rights clause and durational language serve two different purposes. While the former permits an employer to modify or terminate benefits at any time, a durational clause precludes an employer from doing so as long as the CBA is in effect. Thus, the absence of a reservation of rights clause in the Fresno GIPs merely prevented PPG from modifying or terminating any benefits while the relevant CBA was still in effect and does not, as the Union would have us find, undermine the duration clause or demonstrate an ambiguity in the plan documents.[11]

---

[11]  We decline to alter our findings here based on the Union's Notice of New Authority filed on September 29, 2005. Not only is the case upon which it relies an unpublished case from the District of Arizona but its cursory finding that "contrary inferences as to intent are possible" on the limited facts developed is of little help. ASARCO v. United Steel Workers of America, 2005 U.S. Dist. LEXIS 20873 *9 (D. Az. July 26, 2005). Moreover, to the extent that the Court found the language in the CBA ambiguous because it provided that benefits "shall continue," it appears contrary to the Third Circuit's finding in Skinner. Further, with respect to the reservation of rights ("ROR") issue, the CBA in that case contained a clause stating that "health benefits provided are 'subject to the rules and regulations of the Plan not in conflict with [the CBA].'" Id. at * 12. Because the CBA provided for what could be vested benefits, the Court found that the ROR in the SPDs, which was not bargained for, was subordinate to the CBA and could not affect what could be contractually vested or bargained for rights. Not only are the facts in our case distinguishable with respect to language and documents but it does not appear that the question of whether the defendants acquiesced to the inclusion of the ROR or whether they waived their right to object to its

(continued...)

It therefore appears that the plan documents pertaining
to the Fresno Plant are not only devoid of clear and express
language indicating PPG's intent to vest retiree welfare
benefits, but they are without ambiguity, thereby precluding a
finding that PPG intended for retiree medical benefits to vest.[12]

----

[11]     (...continued)
insertion was addressed by the Court.  Having
found that the Union, in fact, waived its right
to object to the duration clause at issue here,
ASARCO does not appear to compel a different
result.

[12]     Having so found, we reiterate here that it is the
plan documents that control and which the Court
must assess to determine whether the right to
lifetime benefits has been established.  Unisys,
58 F.3d at 902.  While we are mindful of the fact
that extrinsic evidence may be used to determine
whether an ambiguity exists in a plan document,
it may not be used to create an ambiguity where
none exists.  See Skinner, 188 F.3d at 145.
Indeed, quoting from Bidlack v. Wheelabrator
Corp., 993 F.2d at 608, the Court in Skinner
opined that before extrinsic evidence should be
considered, "there must be either contractual
language on which to hang the label of ambiguous
or some yawning void ... that cries out for an
implied term.  Extrinsic evidence should not be
used to add terms to a contract that is plausibly
complete without them."  Skinner, 188 F.3d at
146.  Because it appears that no ambiguity exists
in the plan documents at issue here we have not
considered the extrinsic evidence submitted by
the Union.  It should nevertheless be noted that
the evidence submitted by the Union consists
largely of documents other than plan documents
and testimony from Union officials that benefits
were meant to vest or statements allegedly made
to them by PPG representatives to the same
effect.  The Court of Appeals for the Third
Circuit has held, however, that neither
testimonies of union members as to their belief
regarding the duration of retirement benefits nor
an employer's oral undertakings serve to modify
the written terms contained in plan documents
that are otherwise complete.  Skinner, 188 F.3d
at 145-147.  See Depenbrock v. CIGNA Corp., 389
F.3d 78, 81-82 (3d Cir. 2004)(ERISA requires that
all employee benefit plans be established and
maintained pursuant to a written instrument and
                                    (continued...)

As such, the grievance which the Union seeks to arbitrate cannot be said to arise under the contract and, thus, PPG cannot be compelled to arbitrate under the expired CBAs. Litton, supra.

        For these reasons, it is recommended that defendant's motion for summary judgment pertaining to plaintiff's claims regarding defendant's Fresno, California Plant (Docket No. 98) be granted, and that plaintiff's refiled motion for summary judgment (Docket No. 94) be denied.

        Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

                        Respectfully submitted,


                        /s/ Amy Reynolds Hay
                        AMY REYNOLDS HAY
                        United States Magistrate Judge


Dated:    30 September, 2005.


cc:  Hon. David S. Cercone
     United States District Judge

     Michael J. Healey, Esquire
     Healey & Hornack
     Law & Finance Building, Fifth Floor
     Pittsburgh, PA 15219

---

[12]         (...continued)
         precludes oral or informal amendments.)  It
         therefore appears that even if the Court were to
         consider the Union's extrinsic evidence it would
         not compel a different result.

                        31

Sally M. Tedrow, Esquire
O'Donoughe & O'Donoughe
4748 Wisconsin Avenue, NW
Washington, DC 20016

Richard J. Antonelli, Esquire
Spilman Thomas & Battle, PLLC
One Oxford Centre, Suite 3440
301 Grant Street
Pittsburgh, PA 15219

Melvin P. Stein, Esquire
United Steel Workers of America
Five Gateway Center
Room 807
Pittsburgh, PA 15222

William T. Payne, Esquire
Schwartz. Steinsapir, Dohrmann & Sommers
1007 Mt. Royal Boulevard
Pittsburgh, PA 15223

John E. Stember, Esquire
Edward J. Feinstein, Esquire
Pamina Ewing, Esquire
Stephen M. Pincus, Esquire
Stember Feinstein Krakoff
429 Forbes Avenue
1705 Allegheny Building
Pittsburgh, PA 15219