```
                   IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STEEL WORKERS OF        )
AMERICA AFL-CIO-CLC, a labor   )
organization,                  )
                               )
          Plaintiff,           )
                               )
          vs.                  )        Civil Action No. 01-1601
                               )
PPG INDUSTRIES, INC.,          )        Judge Cercone
                               )        Magistrate Judge Hay
                 Defendant.    )
```

<u>REPORT AND RECOMMENDATION</u>

I.   <u>RECOMMENDATION</u>

It is respectfully recommended that defendant's motion
for summary judgment pertaining to plaintiff's claims regarding
defendant's glass manufacturing plants other than the Fresno,
California Plant (Docket No. 101) be granted, and that
plaintiff's refiled motion for summary judgment (Docket No. 94)
be denied.

II.  <u>REPORT</u>

Presently before this Court for disposition are cross-
motions for summary judgment brought by the parties with respect
to the allegations in the complaint pertaining to PPG's glass
manufacturing plants other than the Fresno, California Plant,
which include plants in Creighton, Pennsylvania; Ford City,

Pennsylvania; Cumberland, Maryland; Crystal City, Missouri; Greensburg, Pennsylvania; and Mt. Zion, Illinois.[1]

Plaintiff, United Steelworkers of America, AFL-CIO-CLC ("the Steelworkers" or "the Union"), commenced this action against defendant PPG Industries, Inc. ("PPG"), under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, after PPG notified retirees from, inter alia, the Creighton, Ford City, Cumberland, Crystal City, Greensburg, and Mt. Zion plants in January of 2001 that it was modifying their medical benefits.[2]

---

[1] According to PPG, the first four plants (Creighton, Ford City, Cumberland and Crystal City) constituted a "multi-plant bargaining unit" which the parties referred to as the "Big Glass Plants." PPG's Brief, pp. 1-2 (Docket No. 102). As well, it appears that, in addition to representing the hourly production and maintenance employees at these plants, the Union also represented salaried employees at the Creighton, Ford City and Crystal City plants whose employment was apparently governed by separate CBAs. Id. at 1-2, 4.

[2] As the Court is probably aware, the Union has also alleged in this case that PPG has violated the terms of Collective Bargaining Agreements governing employment at various other PPG plants. Because of the nuances in the various documents associated with each plant, PPG has filed separate motions as to the Memphis Warehouse, the Fresno Plant, the Springdale Plant and the Glass Plants other than the Fresno Plant, which will be dealt with in separate Report and Recommendations. It should also be noted that there are two related cases to this one in which unions other than the Steelworkers have brought similar allegations against PPG for violating various CBAs negotiated by those unions on behalf of PPG employees at other plants. See International Chemical Worker's Union Council of the United Food and Commercial Workers Union and its Locals 45C and 776C v. PPG Industries, Inc., C.A. No. 01-1751 and Local Lodge 470 of District 161, International Association of Machinists and Aerospace Workers v. PPG Industries, Inc., C.A. No. 01-2110. A different set of motions has been
(continued...)

The Union alleges that PPG has reneged on its agreement not to modify or terminate medical benefits for retirees and that PPG's refusal to accept and/or arbitrate the Steelworker's grievance in this regard violates its contractual obligations under the relevant Collective Bargaining Agreements ("CBAs").

Cross-motions for summary judgment have now been filed in which the Union argues that under the broad arbitration clauses contained in the relevant CBAs PPG is obligated to arbitrate the issue of whether the benefits at issue vested and that this Court need only inquire into whether the benefits here are the type that could vest before compelling PPG to do so.  As well, the Union contends that it has provided sufficient evidence to support a finding that the benefits were meant to vest so as to survive summary judgment.[3]  PPG, on the other hand, has taken

---

[2]       (...continued)
         filed in each of these cases which will also be
         addressed separately.

[3]       We note here that after the original motions for
         summary judgment were withdrawn, the Court
         requested that each party wishing to renew its
         motion after discovery was completed resubmit a
         completely new motion at the appropriate civil
         action number so that the record in each case
         would be self contained and so that the Court
         would not have to go on a fishing expedition to
         retrieve the documents needed to resolve each
         motion.  The Union for some reason was unable to
         abide by this request and has simply filed a
         notice that it is reinstating the earlier motion,
         supporting brief and part of the exhibits filed
         in this case in April of 2002, on behalf of the
         plaintiffs in all three cases.  See Docket Nos.
         13-22, 114.  As well, rather than file its own
         comprehensive brief in response to PPG's motions
         in this case, the Union has submitted a document
         in which it merely recites provisions of plan
         documents, see Docket No. 115,  and incorporates
         the brief filed by the International Chemical
                                        (continued...)

3

the position that it has no duty to arbitrate because the
benefits at issue had not vested while the relevant CBAs were in
effect.

Summary judgment is appropriate if, drawing all
inferences in favor of the non-moving party, "the pleadings,
depositions, answers to interrogatories and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R.Civ. P.
56(c).  Summary judgment may be granted against a party who fails
to adduce facts sufficient to establish the existence of any
element essential to that party's case, and for which that party
will bear the burden of proof at trial.  Celotex Corp. v.
Catrett, 477 U.S. 317 (1986).  The moving party bears the initial
burden of identifying evidence which demonstrates the absence of
a genuine issue of material fact.  Once that burden has been met,
the non-moving party must set forth "specific facts showing that
there is a *genuine issue for trial* ... or the factual record will
be taken as presented by the moving party and judgment will be
entered as a matter of law.  Matsushita Electric Industrial Corp.
v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is genuine
only if the evidence is such that a reasonable jury could return
a verdict for the non-moving party.  Anderson v. Liberty Lobby,

---

[3]         (...continued)
        Workers Union Council of the United Food and
        Chemical Workers Union ("ICWUC") in another case.
        Thus, the Union's brief submitted in response to
        PPG's motion here appears as Docket No. 44 in
        Civil Action No. 01-1751.

4

Inc., 477 U.S. 242 (1986).  Thus, it must be determined "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

PPG initially argues that the primary issue before the Court is whether or not the benefits at issue vested or accrued which, in turn, will dictate whether it should be compelled to arbitrate the instant dispute.  The Union counters arguing that the question of whether the benefits are vested goes to the merits of the dispute and is properly decided in arbitration and that in order to compel arbitration the Court need only determine that the claim at issue is the type that could be vested.  This Court, however, has already rejected the Union's position in this regard and has determined that before arbitration may be compelled, the Court must first decide whether the rights at issue, in fact, vested or accrued.

Indeed, review of the record shows that while the Union's original motion for summary judgment was pending, PPG filed a motion to compel discovery arguing that it needed discovery in order to challenge the Union's position posited in its motion that the benefits at issue vested under the relevant CBAs.  PPG's position was that because at least some of the agreements at issue had expired prior to the decision to reduce benefits, the arbitration provisions contained in those

agreements were inapplicable.  Magistrate Judge Benson, who was
then presiding over the pretrial matters in this case, was
therefore put in the position of having to determine what
discovery, if any, was appropriate under Rule 26(b)(1), while
mindful of the Court's limited authority to decide the underlying
issues involved in a suit to compel arbitration.

In resolving the issue, Magistrate Judge Benson relied
principally on Litton Financial Printing Division v. NLRB, 501
U.S. 190 (1991)("Litton"), which, like the instant case, involved
whether disputes arising under an expired CBA are subject to the
arbitration provision contained therein.  The Litton Court held
that the presumption previously announced by the Supreme Court in
Nolde Brothers, Inc. v. Bakery Workers, 430 U.S. 243
(1977)("Nolde"), that the duty to arbitrate disputes arising
under an agreement outlasts the date of expiration, only applies
to "disputes arising under the contract."  The Court went on to
find that "postexpiration grievances can be said to arise under a
contract only where it involves facts and occurrences that arose
before expiration, where an action taken after expiration
infringes a right that accrued or vested under the agreement, or
where, under normal principles of contract interpretation, the
disputed contractual right survives expiration of the remainder
of the agreement."  Litton, 501 U.S. at 205-06.  Magistrate Judge
Benson recognized, as other courts have, that despite the fact
that the Litton Court expressly declined to overrule Nolde, the

two decisions were incongruous.  Memorandum Order, Benson, M.J. (August 2, 2002) (Docket No. 37).

        In an effort to resolve the apparent "tension" between Litton and Nolde, Magistrate Judge Benson took instruction from Luden's Inc. v. Local Union No. 6, 28 F.3d 347 (3d Cir. 1994)("Luden"), in which the Court of Appeals for the Third Circuit noted, albeit in dicta, that Litton held that "a court has the *duty* to reach the merits of the claim, and can order arbitration only if it concludes that the lapsed CBA in fact creates the right or obligation at issue."  Memorandum Order, p. 6, quoting Luden, 28 F.3d at 353-54 (emphasis in original). Opining that the rule set forth in Litton was the Supreme Court's latest and unequivocal statement of the law, Magistrate Judge Benson applied Litton's holding to the instant case and held that: "In this case, where post-expiration conduct is alleged to have violated a right that accrued or vested during the term of a now-expired collectively bargained agreement, the court must make inquiry into whether the right at issue actually vested or accrued while the contract was in force."  Memorandum Order, p. 7.

        It therefore appears, contrary to the Union's assertion, that Magistrate Judge Benson has already determined that the Court must decide whether the benefits at issue vested or accrued prior to the expiration of the relevant CBAs which, in turn, will dictate whether the case should be subject to arbitration.  Because the district court subsequently denied the

Unions' objections to Magistrate Judge Benson's Memorandum Order it now appears to be the law of the case. <u>See</u> Order of Court, Ziegler, J. (October 18, 2002)(Docket No. 46). <u>See also</u> <u>In re City of Philadelphia Litigation</u>, 158 F.3d 711, 718 (3d Cir. 1998)(Finding that absent extraordinary circumstances such as the availability of new evidence, a supervening new law or where the earlier decision was clearly erroneous, the law of the case doctrine precludes the reconsideration of previously decided issues.)

The Union nevertheless makes much of Magistrate Judge Benson's language that the Court only has to "make inquiry" into whether the right at issue actually vested or accrued, arguing that "making an inquiry" into whether the right vested is somehow distinct from actually determining whether the right vested and only requires the Court determine if it is the type of claim that could be vested. We disagree.

Not only has Magistrate Judge Benson already rejected the Union's position that merely having an arguable basis for asserting that the right to retiree welfare benefits vested under the contract is sufficient to compel arbitration, <u>see</u> Memorandum Order, p. 5, but the Union appears to ignore the rest of the Magistrate's Memorandum Order which, when read as a whole, clearly indicates that the Court is required to determine whether or not the benefits at issue here vested before it can determine whether the Union's claims are subject to the relevant arbitration provisions. As already discussed, the holding in

8

Litton, as quoted by Magistrate Judge Benson, states that a post-expiration grievance can be said to arise under a contract, thereby giving rise to the presumption of arbitrability, only where, inter alia, "an action taken after expiration infringes on a right that accrued or vested under the agreement."  Id. at 3. It does not say that the presumption applies where the claim at issue is merely the type of claim that could be vested.  Further, Magistrate Judge Benson specifically stated that the issue in Litton was "whether the contractual right at issue 'vested or accrued' while the CBA was in effect."  Id.  He did not interpret the issue as being whether the contractual right at issue was the type that could be vested or accrued.  Indeed, contrary to the Union's suggestion, the Litton majority did not merely find that the right to have seniority considered in making layoffs was not the type of claim that could be vested but, as noted by Magistrate Judge Benson, it found that the right had, in fact, not vested or accrued prior to the expiration of the contract. Id. at 4.

Moreover, as the Union appears to acknowledge, Magistrate Judge Benson clearly relied on the Third Circuit's findings in Luden, which describes Litton as holding that "a court has the *duty* to reach the merits of the claim, and can order arbitration only if it concludes that the lapsed CBA in fact creates the right or obligation at issue."  Id. at 6.  The Luden Court did not find, nor did Magistrate Judge Benson, that Litton stood for the proposition that the Court is precluded from

reaching the merits of the underlying dispute or that the Court need only determine if the claim is the type that could be vested.

Finally, following Magistrate Judge Benson's statement that "the Court must 'make inquiry' into whether the right at issue actually vested or accrued while the contract was in force," he described his findings as requiring the court to address the merits of the issue.[4]  Under these circumstances, the Union's position that neither <u>Litton</u> nor Magistrate Judge Benson's Memorandum Order requires the court to address the merits of the dispute or to determine whether the benefits at issue here actually vested is not only without merit but is contrary to the law of the case.

As such, we turn to the issue of whether the benefits at issue in this case vested.

As a preliminary matter, we note that the Union has argued that, rather than follow Third Circuit precedent in deciding this issue, the Court should apply precedent as set forth by arbitrators who have decided vesting disputes because the parties in this case "bargained for ... a determination by an arbitrator."  Plaintiff's Brief at p. 36 (C.A. No. 01-1751:

---

[4]      Specifically, Magistrate Judge Benson stated that, "To say, however, that in this case the court must address the merits of the issue, and, hence, that the parties are permitted to conduct discovery, is not to answer the precise question before the court: exactly <u>what</u> discovery is proper?"  Memorandum Order, p. 7.

Docket No. 44).  Of course, the difficulty with the Union's
argument, aside from the fact that it has offered no authority to
support its position, is that it remains to be seen whether the
parties bargained for this particular dispute to be arbitrated.
Whether or not the parties agreed to arbitrate is a determination
that is properly made by the Court and, under Third Circuit
precedent, requires the Court -- not an arbitrator -- to decide
whether the benefits at issue vested.  <u>Litton</u>, <u>supra</u>.  The fact
that the Court may simultaneously resolve the issue that the
Union seeks to arbitrate does not appear to be avoidable and
nevertheless does not provide the basis for ignoring the law of
the this circuit.

        Indeed, in <u>Litton</u>, the Supreme Court expressly
recognized that it could not avoid the duty of determining
whether the parties agreed to arbitrate a post-expiration dispute
simply because that determination would require it to interpret
the language of a bargaining agreement, a responsibility
typically within the purview of the arbitrator.  <u>Id.</u> at 209.  In
fact, the Court proceeded to do just that when, in order to
determine whether the dispute over layoffs was arbitrable, it
found that the right at issue in that case had not vested during
the term of the Agreement.  <u>Id.</u> at 209-210.  Because the issue
here, like in <u>Litton</u>, is whether the parties agreed to arbitrate
in the first instance, it is an issue properly resolved by the
Court under the precedent binding on this Court.

We therefore turn to the Third Circuit's opinion in International Union, United Authomobiule, Aerospace & Agricultural Implement Workers of America v. Skinner Engine Co., 188 F.3d 130 (3d Cir. 1999)("Skinner"), which appears to govern the instant dispute.

As found by the Court in Skinner, ERISA recognizes two types of employee benefit plans: employee welfare plans, which are at issue here, and employee pension plans. Id. at 137. Although pension plans have elaborate vesting requirements under ERISA, it does not require automatic vesting of welfare benefit plans. Id. As the Third Circuit has explained, the difference was not accidental, but, rather, a recognition by Congress that employers need some flexibility regarding their right to alter medical plans due to the fact that the "'costs of such plans are subject to fluctuating and unpredictable variables'" such as "'inflation, changes in medical practice and technology, and increases in the cost of treatment independent of inflation.'" Id. at 138, quoting Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988).

It is undisputed, however, that "in some situations, a welfare plan may provide a vested benefit." In Re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 58 F.3d 896, 902 (3d Cir. 1995)("Unisys"). See Skinner, 188 F.3d at 138. It is the plan participant's burden to prove, by a preponderance of the evidence, that the employer intended the welfare benefits to vest

12

for life.  Id. at 138-39.  The Court of Appeals for the Third
Circuit, however, has cautioned that:

> to vest benefits is to render them forever
> unalterable.  Because vesting of welfare
> benefit plans constitutes an extra-ERISA
> commitment, an employer's commitment to vest
> such benefits is not to be inferred lightly
> and must be stated in clear and express
> language.
>
> *        *        *
>
> These cautionary principles apply without
> regard as to whether the employee welfare
> benefits are provided under a collective
> bargaining agreement, SPD [summary plan
> description], or other plan document; the
> same underlying considerations are present
> irrespective of the particular type of
> document at issue.

Id. at 139.  See Unisys, 58 F.3d at 902 ("[A]ny retiree's right
to a lifetime medical benefit under a plan can only be found if
established by the terms of the ERISA-governed employee benefit
plan .... A court must examine the plan documents.")

It also appears undisputed that while collective
bargaining agreements are generally governed by federal law,
traditional rules of contract construction apply when not
inconsistent with federal labor law.  See Skinner, 188 F.3d at
138.  Moreover, how a plan document or CBA should be interpreted
is typically a question of law and where a CBA is clear and
unambiguous, its meaning must be determined as a matter of law.
Id.

In the instant case, PPG has represented, and the Union
does appear to dispute, that until February of 1969, PPG's
obligations under the Big Glass CBAs with respect to medical

13

insurance extended only to active employees.  PPG Exh. 18: Bono

Aff. ¶ 8.[5]  The February 16, 1969 CBA pertaining to the Big Glass

Plants, however, included Supplemental Agreement No. 8, which

provided that:

> III.  Group Hospital and Surgical Benefits
> Insurance Program
>
> 1.   Effective May 1, 1969 or as promptly
>      thereafter as cancellation of the
>      existing group hospital and surgical
>      insurance for a Local can be effected,
>      the Company shall provide at its expense
>      to active employees and pensioners in
>      that Local, Hospital and Medical
>      insurance with benefits paralleling
>      those provided in the Michigan Type Plan
>      for Group Hospitalization and Surgical
>      coverage.  Effective February 1, 1971
>      the Company shall provide a prescription
>      drug program-Michigan Type Blue
>      Cross/Blue Shield at its expense to
>      active employees and pensioners under
>      age 65.  Such benefits are more fully
>      described in the Booklet titled Michigan
>      Blue Cross-Blue Shield Hospitalization
>      Plan, a copy of which has been given to
>      the Union and which, so far as benefits
>      are concerned, is incorporated by
>      reference as part of this Agreement.

PPG Exh. 1: 2/16/69 CBA, p. 91.  See PPG Exh. 18: Bono Aff. ¶ 9.[6]

This provision, it appears, has been repeated in every Big Glass

Plant CBA thereafter except that in December of 1993, the Big

---

[5]     Unless otherwise indicated all of PPG's Exhibits
        appear at Docket No. 103.

[6]     We note here that PPG has represented, without
        challenge by the Union, that the benefits agreed
        to between the parties for the Big Glass Plants
        are also applicable to the CBAs concerning
        salaried employees at the Creighton, Ford City
        and Crystal City Plants and to the CBAs covering
        the remaining glass manufacturing plants.  PPG's
        Brief in Support of its Motion, pp. 4-5.  See PPG
        Exh. 18: Bono Aff. ¶ 13.

Glass Plant CBA began to refer to the Group Insurance Plan booklet ("GIP"), through which retiree medical benefits were provided, rather than the Michigan Plan.[7]  See PPG Exh. 18: Bono Aff. ¶¶ 10, 18.

    As well, it appears that the Creighton CBA governing salaried employees, which had also contained the above provision, including the 1993 modification, was modified in September of 1999 to read: "INSURANCE AND PENSIONS. All insurance and pensions are incorporated into the Group Benefits Plan Booklet or Pension Plan document."  PPG Exh. 2: 9/1/99 CBA, Article 21, p. 15.  See PPG Exh. 18: Bono Aff. ¶ 11.[8]  Similarly, the Creighton CBA dated March 1, 2003, provides that: "The parties have agreed to a Group Benefits Plan Booklet, a copy of which has been given to the Union and which is incorporated by reference as part of the Agreement."  PPG Exh. 3: 3/1/03 CBA, Supplemental Agreement No. 15.  See PPG Exh. 18: Bono Aff. ¶ 12.

    It also appears undisputed that the February 16, 1969 Big Glass Plant GIP is the first GIP to provide for retiree medical benefits.  Specifically, it provides that:

        Retirement

---

[7]        GIPs are also referred to as Summary Plan Descriptions ("SPDs"), which is the moniker used by the Union.  Because the booklets describing the benefits in this case are called Group Insurance Plans we have referred to them as GIPs.

[8]        It appears that by 1999, the Ford City, Cumberland, Crystal City and Greensburg plants were no longer functioning, leaving only the Creighton and Mt. Zion plants in operation.  PPG's Brief, p. 4 n.3 (Docket No. 102).

> If you retire under the Pension Plan or
> the Social Security Act, or upon the
> attainment of age 65, which ever shall occur
> sooner, the following provisions will be
> applicable to your coverage under the
> program:
>
>         *     *     *
>
> (c)  Blue Cross and Blue Shield Benefits --
>
> > Such coverage will be continued in
> > effect thereafter, without cost to
> > you, in accordance with paragraph
> > 7.5 [the Medicare offset
> > provision].

PPG Exh. 1A: 2/16/69 GIP § 8.14. <u>See</u> PPG Exh. 18: Bono Aff. ¶¶ 18, 19. Each succeeding GIP, it appears, contains this provision as well. <u>See</u> PPG Exh. 18: Bono Aff. ¶ 20.

PPG argues that there is not only no clear and express language in any of these plan documents which would indicate a commitment by PPG to vest retiree medical benefits but that the language that is contained in the documents expressly limits PPG's obligation in this respect. Specifically, PPG points to the fact that each Big Glass CBA since February 16, 1969 contains a termination clause which provides that:

> The foregoing constitutes an Agreement
> between the Company and the United Glass and
> Ceramic Workers of North America, AFL-CIO-
> CLC, in the plants enumerated in the first
> paragraph of this Agreement and is to become
> effective February 16, 1969 and shall remain
> in full force and effect until 12:00 Noon on
> February 16, 1972.

PPG Exh. 1: 2/16/69 CBA, Article 33, p. 51. <u>See</u> PPG Exh. 18: Bono Aff. ¶¶ 16, 17.

Moreover, it appears that each Big Glass Plant GIP since 1984 contains a duration clause which states that:

> The Company will continue the benefits described herein for active and retired employees consistent with the terms and conditions of the labor agreement for the duration of such agreement.... In the event of termination of the labor agreement, you have the same rights as to claim submission and review and conversion rights as you would have under individual termination coverage.

PPG Exh. 4: 2/16/84 GIP, p. 5. See PPG Exh. 18: Bono Aff. ¶¶ 21, 22. It also appears that the Big Glass Plant GIPs, as well as those pertaining to the Creighton Plant, were provided to and reviewed by the Union before they were published. PPG Exh. 18: Bono Aff. ¶ 23. Under these provisions, it would appear that PPG's obligation to provide benefits was limited to the duration of the then-current CBA.

The Union does not dispute that these provisions are contained in the relevant plan documents nor does it point to any clear and express language in the plan documents which would suggest that PPG intended for retiree medical benefits to vest. Rather, the Union contends that it did not bargain for the duration clauses set forth in the GIPs and that, nevertheless, only the benefit terms were incorporated into the CBAs and not the duration clauses.

The Union, however, has not provided any support for its position that PPG unilaterally inserted the duration clause in the GIPs or that it was unaware of the fact that they had been included, but instead asks the Court to infer as much from the

fact that the clause began appearing in the GIPs somewhere between 1984 and 1987 and that it subsequently became an issue in 1993 after PPG first indicated that a modification in benefits might be forthcoming.[9]

Even if it were true, however, that PPG surreptitiously inserted the language in the GIP, it is undisputed that the language has been included in every Big Glass Plant GIP since 1984 and that the Union reviewed each GIP prior to its publication. Indeed, Mr. Murphy, formerly a union officer with the Union's predecessor who negotiated labor agreements with PPG, testified at his deposition that the Union had the opportunity to review each GIP and that if there were any mistakes or misstatements contained therein the Union would have an opportunity to call that to PPG's attention. PPG Exh. 1: Murphy Depo. p. 125 (Docket No. 119).[10]  Under these circumstances, it appears unreasonable to infer that the Union was somehow unaware of the durational clause until 1993 when PPG decided to make

---

[9] Indeed, we note here that because the Union has merely incorporated the brief filed in opposition to PPG's motion for summary judgment at Civil Action No. 01-1751, most of the evidence cited by the Union relates to negotiations involving the ICWUC, and not the Steelworkers, and plan proposals pertaining to plants other than the glass manufacturing plants and, thus, cannot provide the basis for finding a material issue exists in this case.

[10] Although the Union has referred the Court to a letter from the Union's Roy Albert to Herman Bono at PPG for the proposition that the Union only reviewed the changes made to the GIPs and not the entire document, the letter is devoid of any language to that effect. See Union Exh. 6: 6/12/93 Letter.  Unless otherwise indicated all the Union's exhibits appear at Docket No. 116.

changes in retiree medical benefits.  See Maurer v. Joy
Technologies, Inc., 212 F.3d 907, 919 (6th Cir. 2000) (Finding
that the union was precluded from arguing that the plaintiffs'
retirement benefits vested in light of the reservation of rights
clause that, while unilaterally inserted by the company, was
conspicuously contained in the insurance booklet and remained
uncontested for three years.)

        Nor do we find persuasive the Union's argument that,
notwithstanding whether it was aware of the duration clause, it
was not included in the portion of the GIP that was incorporated
into the CBA.  To support its position, the Union cites to the
1996 Creighton, Pennsylvania CBA, which provides that: "A copy of
[the GIP] shall be provided to each plan participant and which,
so far as benefits are concerned, is incorporated by reference as
part of this Agreement."  See Union Exh. 5: Murphy Aff. ¶ 8.  The
Union then asserts based on this provision that the only items
being incorporated are the benefits themselves and not the
duration clause.  We disagree.

        First, it appears from this provision that the CBA
incorporated anything that "concerned" benefits.  Certainly, a
provision governing the duration of those benefits would appear
to fall under that category.  Second, not only has Mr. Murphy
attested to the fact that the booklets themselves, which fully
described the benefits contained therein, were incorporated into
the CBA's and not merely the benefit terms, PPG Exh. 11: Murphy
Aff. ¶ 8, but, as argued by PPG, the fact that the duration

19

clause became a "stumbling block" in the 1996 negotiations because the Union wanted the language removed appears to suggest that the Union considered it to be part of the agreement in the first instance.

Finally, notwithstanding whether the duration clauses contained in the GIPs were incorporated into the CBAs, it is undisputed that the CBAs themselves contain a termination provision.  See PPG Exh. 1: 2/16/69 CBA, Article 33, p. 51.  See PPG Exh. 18: Bono Aff. ¶ 16.  Thus, it appears, rather than contain clear and express language which would demonstrate that PPG intended the retiree medical benefits to vest, the plan documents contain language indicating just the opposite.

The Union nevertheless argues that the plan documents, and in particular the language contained in the GIPs stating that PPG "will continue" the benefits at issue, are ambiguous, thereby requiring the Court to look beyond the plan documents themselves to decide the vesting issue.

The Court of Appeals for the Third Circuit, however, has specifically rejected the notion that under these circumstances the phrase "will continue" included in provisions providing medical benefits is ambiguous.  To the contrary, in assessing a series of CBAs containing the same "will continue" language at issue here, the Third Circuit found that:

> It cannot be said that the phrases clearly and expressly indicate vesting since there is simply no durational language to qualify these phrases.  That is, the CBAs do not state that retiree benefits "will continue for the life of the retiree," or that they

"shall remain unalterable for the life of the
retiree."  An equally reasonable
interpretation is that the benefits "will
continue until the CBA expires," or that they
"shall remain ... until the CBA expires."
Indeed, the latter interpretation appears to
be the more reasonable in light of the
durational provisions in all of the CBAs.
Section 46 of the 1986-1989 CBA is
illustrative: "This Agreement represents a
complete resolution of all non economic items
and shall, in all of its terms, remain in
effect from July 1, 1986 until midnight, June
30, 1989 ...."  Read in conjunction with the
durational clauses, the phrases could be
interpreted to mean, for instance, that the
medical benefits "will continue until
midnight of June 30, 1989."

                    *         *         *

The phrases, "will continue" and "shall
remain," as discussed above, are simply not
susceptible to more than one reasonable
interpretation, and they do not somehow
render the CBA's incomplete or ambiguous.

Skinner, 188 F.3d at 141, 146.

        The Union nevertheless attempts to distinguish this

case from Skinner and argues that the differences require a

finding that the "will continue" language found in the instant

case is ambiguous.

        The Union first contends that because other courts have

reviewed language similar to the "will continue" language at

issue here and have determined that such language is ambiguous or

vests in favor of retirees this Court should as well.  In so

arguing, the Union relies on a series of cases from the Court of

Appeals for the Fourth and Sixth Circuits that have followed the

Sixth Circuit's holding in International Union, United

Automobile, Aerospace, and Agricultural Implement Workers of

America v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1983), cert.
denied, 465 U.S. 1007 (1984)("Yard-Man"), in which it was found
that such "will continue" language creates a presumption that the
parties intended retiree welfare benefits to continue for life.
See U.A.W. v. BVR Liquidating, Inc., 190 F.3d 768 (6th Cir.
1999), cert. denied, 529 U.S. 1067 (2000); Keffer v. H.K. Porter
Co., 872 F.2d 60 (4th Cir. 1989); Smith v. ABS Industries, Inc.,
890 F.2d 841, 847 (6th Cir. 1989).  As acknowledged by the Union
elsewhere in its brief, however, the Court of Appeals for the
Third Circuit in Skinner specifically, and repeatedly, declined
to adopt what has been termed the "Yard-Man presumption" or Yard-
Man's interpretation of the relevant contract language.  Skinner,
188 F.3d at 139, 140, 141.  In fact, the Third Circuit
subsequently described its opinion in Skinner as creating a
presumption against vesting with respect to welfare benefit
plans.  Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc.
Employee Health and Welfare Plan, 298 F.3d 191, 196 (3d Cir.
2002).  Thus, it appears that the Union's reliance on Yard-Man
and its progeny is misplaced.

        Nor do the remaining cases cited by the Union compel a
different result as the plan documents in those cases, unlike in
this case, did not contain any clauses limiting the duration of
benefits or the terms of the agreement.  See Rossetto v. Pabst
Brewing Co., 217 F.3d 539 (7th Cir. 2000), cert. denied, 531 U.S.
1192 (2001); Bidlack v. Wheelabrator Corp., 993 F.2d 603 (7th
Cir.), cert. denied, 510 U.S. 909 (1993).  Thus, none of the

cases relied upon by the Union serves to find either that an ambiguity exists in the plan documents or that the retiree benefits vested.

Similarly, the Union has cited several cases for the proposition that "surviving spouse" provisions, i.e., provisions that provide for continued medical insurance coverage for the surviving spouse of a retired employee until the spouse's death, evidence an intent to vest.  See United Rubber, Cork, Linoleum & Plastic Workers v. Pirelli Armstrong Tire Corp., 873 F. Supp. 1093 (M.D. Tenn. 1994); U.A.W. v. Loral Corp., 873 F. Supp. 57 (N.D. Ohio 1994), affirmed, 107 F.3d 11 (6th Cir. 1997).  These cases, however, also relied on the Yard-Man presumption which, as already discussed, the Court of Appeals for the Third Circuit has specifically rejected.  Skinner, 188 F.3d at 139, 140, 141. Moreover, as argued by PPG, there was no language contained in the documents in these cases that expressly limited the duration of the benefits to the term of the agreement as exists here. Thus, these cases do not appear to provide the basis for departing from Skinner or for finding that plan documents at issue in this case are ambiguous.

The Union also argues that because the provisions in the GIPs for Life, Accidental Death and other insurance programs have specific termination language attached to them that the absence of termination language in the plan documents with respect to retiree medical benefits suggests that the latter were intended to vest.  These provisions, however, as acknowledged by

the Union, indicate that coverage is to end upon retirement and does not serve to limit the duration of benefits enjoyed during retirement as is at issue here.  <u>See</u> Plaintiff's Brief, p. 53 (C.A. No. 1751: Docket No. 44); Plaintiff's "Memorandum of Law," pp. 6-7 (Docket No. 115).[11]  In this manner, the fact that the plan documents are devoid of language specifically pertaining to the termination of retiree medical benefits does not negate the other durational clauses contained in the relevant plan documents.  <u>Cf.</u> <u>Skinner</u>, 188 F.3d at 147 ("Silence on duration ... may not be interpreted as an agreement to vest retiree benefits in perpetuity.")

Further, the cases relied upon by the Union to support its position are, as before, <u>Yard-man</u> and <u>United Rubber, Cork, Linoleum & Plastic Workers v. Pirelli Armstrong Tire Corp.</u>, 873 F. Supp. at 1100, which relied upon <u>Yard-Man</u>.  While these courts may have found that the inclusion of specific durational limitations in other provisions of plan documents suggests that retiree benefits not so limited were intended to vest, they so found having first accepted the presumption that retiree benefits were intended to vest.  Proceeding under the opposite presumption -- that such benefits were not intended to vest -- as we must, the fact that other provisions may have separate durational

---

[11]      We note here that the exhibits referred to in the Union's "Memorandum of Law" submitted in opposition to PPG's motion (Docket No. 115), appear to refer to the exhibits submitted in support of its "refiled" motion for summary judgment and appear as Exhibits 2, 16, 20, 57, 61 and 72 to the Affidavit of John J. Murphy at Docket Nos. 17, 18, 20 and 21.

language attached to them does not appear to overcome that
presumption that the GIP limits the provision of medical benefits
provided for therein to the terms of the CBA.  Thus, it does not
appear that either <u>Pirelli</u> or <u>Yard-Man</u> provides the basis for
finding an ambiguity or for ignoring <u>Skinner</u>'s requirement that
an employer's commitment to vest retiree benefits must be stated
in clear and express language in order to overcome the
presumption against vesting.

The Union's next argument, suggesting that an ambiguity
exists because the "will continue" language appears in the first
GIP and, thus, unlike in <u>Skinner</u>, could not refer back to prior
plan documents, is contradicted by the record and does not appear
to apply to the documents at issue here.  Indeed, it appears that
the Big Glass Plant CBA dated February 16, 1969, which is the
earliest of record, states that "the Company shall provide at its
expense to active employees and pensioners ... Hospital and
Medical insurance ... [and] a prescription drug program ...."
PPG Exh. 1: 2/16/69 CBA, Supplemental Agreement No. 8, p. 91.  In
fact, most of the CBA provisions cited by the Union that pertain
to the Big Glass Plants also state that the Company "shall
provide" benefits and not that they "will continue" to do so.
<u>See</u> Plaintiff's "Memorandum of Law," pp. 3-6 (Docket No. 115).[12]

---

[12]         Of course, it goes without saying that the GIPs
         referenced in the brief filed at C.A. No. 01-1751
         (Docket No. 44), which the Union has incorporated
         here, have no relevancy to the instant motion as
         they concern PPG's plant located in Martinsville,
         West Virginia, not the Big Glass Plants, and
         pertain to CBAs negotiated with the ICWUC and not
                                          (continued...)

Moreover, the import of _Skinner_'s findings in this regard, as the Union itself has argued, is that the contract must be viewed as a whole and the phrase "will continue" must be read in context rather than in a vacuum. Here, it is undisputed that since 1984 the Big Glass Plant GIPs contains a durational clause limiting PPG's obligation with respect to retiree benefits to the term of the CBA. It would therefore appear that when read in context the "will continue" language to the extent that it appears in any of the plan documents can be read only to suggest that benefits will continue for the duration of the CBA.

Indeed, it appears significant that in addressing this issue, the Court in _Skinner_ cites to _Senn v. United Dominion Industries, Inc._, 951 F.2d 806, 816 (7th Cir. 1992), _cert. denied_, 509 U.S. 903 (1993), in which the first CBA entered into between the parties also contained "will continue" language in the provisions providing for insurance benefits for retired employees. _Id._ at 808. The Court nevertheless found that "it requires more than a statement in a CBA that welfare benefits 'will continue' to create an ambiguity about vesting, for the logical interpretation under our rule is that benefits 'will continue' for the duration of the contract." _Id._ at 816. Thus, even if the first CBA at issue in this case contained the "will continue" language, it appears of little significance as it does not create an ambiguity or negate the fact that under _Skinner_

---

[12]        (...continued)
            the Steelworkers.  _Id._ at pp. 53-4.

there must be clear and express language to overcome the presumption against vesting, which is clearly absent here.

In another attempt to convince the Court that an ambiguity exists in this case, the Union points to the fact that the Court in <u>Skinner</u> found, at least in part, that the "will continue" language was unambiguous because it applied to benefits for both active and retired employees and that because benefits for active employees cannot vest, it followed that they did not vest for the retired employees either.  Although the Union argues that the "will continued" language in the GIPs in effect when the Union participants retired in this case only applied to retirees, thereby distinguishing itself from <u>Skinner</u>, the record is to the contrary.  Indeed, without exception, all the provisions providing benefits cited by the Union apply to active employees as well as retirees and, thus, appear to fall squarely under <u>Skinner</u>.  <u>See</u> Plaintiff's "Memorandum of Law," pp. 3-6 (Docket No. 115).[13]

Finally, the Union argues that an ambiguity in the plan documents exists as evidenced by the fact that PPG failed to

---

[13]      Moreover, as previously discussed, to the extent that the Union has again relied on the ICWUC's brief filed in C.A. No. 01-1751, to support its argument here, we note that the only evidence cited therein concerns PPG's plants located in Martinsville, West Virginia and Circleville, Ohio, and CBAs negotiated by the ICWUC and not the Steelworkers.  <u>See</u> Plaintiff's Brief, p. 54 (C.A. No. 01-1751: Docket No. 44).  Because these documents have no relevance to the glass manufacturing plants at issue here, they cannot provide the basis for finding that an ambiguity exists.

include a "reservation of rights" provision in any of the GIPs,
except for that pertaining to the Memphis Plant.  Having included
a reservation of rights clause in the Memphis GIP, the Union
appears to suggest that PPG's deliberate omission of one in the
GIPs governing its other plants somehow nullifies the duration
clauses contained therein.  The Union, however, has cited no
authority for its position or any that would support a finding
that a reservation of rights clause must be included in order to
express the intent that benefits were not to vest.  Perhaps the
Union has not done so in light of <u>Skinner</u>, which demonstrates
that under the law of this circuit a duration clause alone can
effectively minimize an employer's obligation to provide retiree
welfare benefits.

        Moreover, as argued by PPG, a reservation of rights
clause and durational language serve two different purposes.
While the former permits an employer to modify or terminate
benefits at any time, a durational clause precludes an employer
from doing so as long as the CBA is in effect.  Thus, the absence
of a reservation of rights clause in the Big Glass GIPs merely
prevented PPG from modifying or terminating any benefits while
the relevant CBA was still in effect and does not, as the Union
would have us find, undermine the duration clause or demonstrate
an ambiguity in the plan documents.[14]

---

[14]     We decline to alter our findings here based on
the Union's Notice of New Authority filed on
September 29, 2005.  Not only is the case upon
which it relies an unpublished case from the
District of Arizona but its cursory finding that
                                        (continued...)

It therefore appears that the plan documents pertaining to the PPG's Glass Plants other than the Fresno Plant are not only devoid of clear and express language indicating PPG's intent to vest retiree welfare benefits, but they are without ambiguity, thereby precluding a finding that PPG intended for retiree medical benefits to vest.[15]  As such, the grievance which the

---

[14]       (...continued)
"contrary inferences as to intent are possible" on the limited facts developed is of little help. ASARCO v. United Steel Workers of America, 2005 U.S. Dist. LEXIS 20873 *9 (D. Az. July 26, 2005). Moreover, to the extent that the Court found the language in the CBA ambiguous because it provided that benefits "shall continue," it appears contrary to the Third Circuit's finding in Skinner.  Further, with respect to the reservation of rights ("ROR") issue, the CBA in that case contained a clause stating that "health benefits provided are 'subject to the rules and regulations of the Plan not in conflict with [the CBA].'" Id. at * 12.  Because the CBA provided for what could be vested benefits, the Court found that the ROR in the SPDs, which was not bargained for, was subordinate to the CBA and could not affect what could be contractually vested or bargained for rights.  Not only are the facts in our case distinguishable with respect to language and documents but it does not appear that the question of whether the defendants acquiesced to the inclusion of the ROR or whether they waived their right to object to its insertion was addressed by the Court.  Having found that the Union, in fact, waived its right to object to the duration clause at issue here, ASARCO does not appear to compel a different result.

[15]       Having so found, we reiterate here that it is the plan documents that control and which the Court must assess to determine whether the right to lifetime benefits has been established.  Unisys, 58 F.3d at 902.  While we are mindful of the fact that extrinsic evidence may be used to determine whether an ambiguity exists in a plan document, it may not be used to create an ambiguity where none exists. See Skinner, 188 F.3d at 145. Indeed, quoting from Bidlack v. Wheelabrator Corp., 993 F.2d at 608, the Court in Skinner
                                    (continued...)

Union seeks to arbitrate cannot be said to arise under the
contract and, thus, PPG cannot be compelled to arbitrate under
the expired CBAs.  <u>Litton</u>, <u>supra</u>.

For these reasons, it is recommended that defendant's
motion for summary judgment pertaining to plaintiff's claims
regarding defendant's glass manufacturing plants other than the
Fresno, California Plant (Docket No. 101) be granted, and that
plaintiff's refiled motion for summary judgment (Docket No. 94)
be denied.

Within ten (10) days of being served with a copy, any
party may serve and file written objections to this Report and

---

[15]        (...continued)
opined that before extrinsic evidence should be
considered, "there must be either contractual
language on which to hang the label of ambiguous
or some yawning void ... that cries out for an
implied term.  Extrinsic evidence should not be
used to add terms to a contract that is plausibly
complete without them."  <u>Skinner</u>, 188 F.3d at
146.  Because it appears that no ambiguity exists
in the plan documents at issue here we have not
considered the extrinsic evidence submitted by
the Union.  It should nevertheless be noted that
the evidence submitted by the Union consists
largely of documents other than plan documents
and testimony from Union officials that benefits
were meant to vest or statements allegedly made
to them by PPG representatives to the same
effect.  The Court of Appeals for the Third
Circuit has held, however, that neither
testimonies of union members as to their belief
regarding the duration of retirement benefits nor
an employer's oral undertakings serve to modify
the written terms contained in plan documents
that are otherwise complete.  <u>Skinner</u>, 188 F.3d
at 145-147.  <u>See</u> <u>Depenbrock v. CIGNA Corp.</u>, 389
F.3d 78, 81-82 (3d Cir. 2004)(ERISA requires that
all employee benefit plans be established and
maintained pursuant to a written instrument and
precludes oral or informal amendments.)  It
therefore appears that even if the Court were to
consider the Union's extrinsic evidence it would
not compel a different result.

recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,


/s/ Amy Reynolds Hay
AMY REYNOLDS HAY
United States Magistrate Judge


Dated:  30 September, 2005.


cc:  Hon. David S. Cercone
     United States District Judge

     Michael J. Healey, Esquire
     Healey & Hornack
     Law & Finance Building, Fifth Floor
     Pittsburgh, PA 15219

     Sally M. Tedrow, Esquire
     O'Donoughe & O'Donoughe
     4748 Wisconsin Avenue, NW
     Washington, DC 20016

Richard J. Antonelli, Esquire
Spilman Thomas & Battle, PLLC
One Oxford Centre, Suite 3440
301 Grant Street
Pittsburgh, PA 15219

Melvin P. Stein, Esquire
United Steel Workers of America
Five Gateway Center
Room 807
Pittsburgh, PA 15222

William T. Payne, Esquire
Schwartz. Steinsapir, Dohrmann & Sommers
1007 Mt. Royal Boulevard
Pittsburgh, PA 15223

John E. Stember, Esquire
Edward J. Feinstein, Esquire
Pamina Ewing, Esquire
Stephen M. Pincus, Esquire
Stember Feinstein Krakoff
429 Forbes Avenue
1705 Allegheny Building
Pittsburgh, PA 15219