IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STEEL WORKERS OF           )
AMERICA AFL-CIO-CLC, a labor      )
organization,                     )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )    Civil Action No. 01-1601
                                  )
PPG INDUSTRIES, INC.,             )    Judge Cercone
                                  )    Magistrate Judge Hay
               Defendant.         )

<u>REPORT AND RECOMMENDATION</u>

I.   <u>RECOMMENDATION</u>

          It is respectfully recommended that defendant's motion
for summary judgment pertaining to plaintiff's claims regarding
defendant's Springdale, Pennsylvania Plant (Docket No. 104) be
granted, and that plaintiff's refiled motion for summary judgment
(Docket No. 94) be denied.

II.  <u>REPORT</u>

          Presently before this Court for disposition are cross-
motions for summary judgment brought by the parties with respect
to the allegations in the complaint pertaining to PPG's
Springdale, Pennsylvania Plant ("the Springdale Plant").

          Plaintiff, United Steelworkers of America, AFL-CIO-CLC
("the Steelworkers" or "the Union"), commenced this action
against defendant PPG Industries, Inc. ("PPG"), under section 301
of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185,
after PPG notified retirees from, <u>inter alia</u>, the Springdale

Plant in January of 2001 that it was modifying their medical benefits.[1]  The Union alleges that PPG has reneged on its agreement not to modify or terminate medical benefits for retirees and that PPG's refusal to accept and/or arbitrate the Steelworker's grievance in this regard violates its contractual obligations under the relevant Collective Bargaining Agreements ("CBAs").

Cross-motions for summary judgment have now been filed in which the Union argues that under the broad arbitration clauses contained in the relevant CBAs PPG is obligated to arbitrate the issue of whether the benefits at issue vested and that this Court need only inquire into whether the benefits here are the type that could vest before compelling PPG to do so.  As well, the Union contends that it has provided sufficient evidence

---

[1]     As the Court is probably aware, the Union has also alleged in this case that PPG has violated the terms of Collective Bargaining Agreements governing employment at various other PPG plants. Because of the nuances in the various documents associated with each plant, PPG has filed separate motions as to the Springdale Plant, the Fresno Plant, the Memphis Warehouse and the Glass Plants other than the Fresno Plant, which will be dealt with in separate Report and Recommendations.  It should also be noted that there are two related cases to this one in which unions other than the Steelworkers have brought similar allegations against PPG for violating various CBAs negotiated by those unions on behalf of PPG employees at other plants.  See International Chemical Worker's Union Council of the United Food and Commercial Workers Union and its Locals 45C and 776C v. PPG Industries, Inc., C.A. No. 01-1751 and Local Lodge 470 of District 161, International Association of Machinists and Aerospace Workers v. PPG Industries, Inc., C.A. No. 01-2110.  A different set of motions has been filed in each of these cases which will also be addressed separately.

to support a finding that the benefits were meant to vest so as to survive summary judgment.[2]  PPG, on the other hand, has taken the position that it has no duty to arbitrate because the benefits at issue had not vested while the relevant CBAs were in effect.

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.Civ. P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party

---

[2]  We note here that after the original motions for summary judgment were withdrawn, the Court requested that each party wishing to renew its motion after discovery was completed resubmit a completely new motion at the appropriate civil action number so that the record in each case would be self contained and so that the Court would not have to go on a fishing expedition to retrieve the documents needed to resolve each motion.  The Union for some reason was unable to abide by this request and has simply filed a notice that it is reinstating the earlier motion, supporting brief and part of the exhibits filed in this case in April of 2002, on behalf of the plaintiffs in all three cases.  See Docket Nos. 13-22, 114.  As well, rather than file its own comprehensive brief in response to PPG's motions in this case, the Union has submitted a document in which it merely recites provisions of plan documents, see Docket No. 115,  and incorporates the brief filed by the International Chemical Workers Union Council of the United Food and Chemical Workers Union ("ICWUC") in another case.  Thus, the Union's brief submitted in response to PPG's motion here appears as Docket No. 44 in Civil Action No. 01-1751.

will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial* ... or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  Thus, it must be determined "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

PPG initially argues that the primary issue before the Court is whether or not the benefits at issue vested or accrued which, in turn, will dictate whether it should be compelled to arbitrate the instant dispute.  The Union counters arguing that the question of whether the benefits are vested goes to the merits of the dispute and is properly decided in arbitration and that in order to compel arbitration the Court need only determine that the claim at issue is the type that could be vested.  This Court, however, has already rejected the Union's position in this

4

regard and has determined that before arbitration may be compelled, the Court must first decide whether the rights at issue, in fact, vested or accrued.

Indeed, review of the record shows that while the Union's original motion for summary judgment was pending, PPG filed a motion to compel discovery arguing that it needed discovery in order to challenge the Union's position posited in its motion that the benefits at issue vested under the relevant CBAs.  PPG's position was that because at least some of the agreements at issue had expired prior to the decision to reduce benefits, the arbitration provisions contained in those agreements were inapplicable.  Magistrate Judge Benson, who was then presiding over the pretrial matters in this case, was therefore put in the position of having to determine what discovery, if any, was appropriate under Rule 26(b)(1), while mindful of the Court's limited authority to decide the underlying issues involved in a suit to compel arbitration.

In resolving the issue, Magistrate Judge Benson relied principally on Litton Financial Printing Division v. NLRB, 501 U.S. 190 (1991)("Litton"), which, like the instant case, involved whether disputes arising under an expired CBA are subject to the arbitration provision contained therein.  The Litton Court held that the presumption previously announced by the Supreme Court in Nolde Brothers, Inc. v. Bakery Workers, 430 U.S. 243 (1977)("Nolde"), that the duty to arbitrate disputes arising under an agreement outlasts the date of expiration, only applies

5

to "disputes arising under the contract."  The Court went on to
find that "postexpiration grievances can be said to arise under a
contract only where it involves facts and occurrences that arose
before expiration, where an action taken after expiration
infringes a right that accrued or vested under the agreement, or
where, under normal principles of contract interpretation, the
disputed contractual right survives expiration of the remainder
of the agreement."  <u>Litton</u>, 501 U.S. at 205-06.  Magistrate Judge
Benson recognized, as other courts have, that despite the fact
that the <u>Litton</u> Court expressly declined to overrule <u>Nolde</u>, the
two decisions were incongruous.  Memorandum Order, Benson, M.J.
(August 2, 2002) (Docket No. 37).

In an effort to resolve the apparent "tension" between
<u>Litton</u> and <u>Nolde</u>, Magistrate Judge Benson took instruction from
<u>Luden's Inc. v. Local Union No. 6</u>, 28 F.3d 347 (3d Cir.
1994)("<u>Luden</u>"), in which the Court of Appeals for the Third
Circuit noted, albeit in <u>dicta</u>, that <u>Litton</u> held that "a court
has the *duty* to reach the merits of the claim, and can order
arbitration only if it concludes that the lapsed CBA in fact
creates the right or obligation at issue."  Memorandum Order, p.
6, quoting <u>Luden</u>, 28 F.3d at 353-54 (emphasis in original).
Opining that the rule set forth in <u>Litton</u> was the Supreme Court's
latest and unequivocal statement of the law, Magistrate Judge
Benson applied <u>Litton's</u> holding to the instant case and held
that: "In this case, where post-expiration conduct is alleged to
have violated a right that accrued or vested during the term of a

6

now-expired collectively bargained agreement, the court must make inquiry into whether the right at issue actually vested or accrued while the contract was in force."  Memorandum Order, p. 7.

It therefore appears, contrary to the Union's assertion, that Magistrate Judge Benson has already determined that the Court must decide whether the benefits at issue vested or accrued prior to the expiration of the relevant CBAs which, in turn, will dictate whether the case should be subject to arbitration.  Because the district court subsequently denied the Unions' objections to Magistrate Judge Benson's Memorandum Order it now appears to be the law of the case.  <u>See</u> Order of Court, Ziegler, J. (October 18, 2002)(Docket No. 46).  <u>See also</u> <u>In re City of Philadelphia Litigation</u>, 158 F.3d 711, 718 (3d Cir. 1998)(Finding that absent extraordinary circumstances such as the availability of new evidence, a supervening new law or where the earlier decision was clearly erroneous, the law of the case doctrine precludes the reconsideration of previously decided issues.)

The Union nevertheless makes much of Magistrate Judge Benson's language that the Court only has to "make inquiry" into whether the right at issue actually vested or accrued, arguing that "making an inquiry" into whether the right vested is somehow distinct from actually determining whether the right vested and only requires the Court determine if it is the type of claim that could be vested.  We disagree.

7

Not only has Magistrate Judge Benson already rejected the Union's position that merely having an arguable basis for asserting that the right to retiree welfare benefits vested under the contract is sufficient to compel arbitration, <u>see</u> Memorandum Order, p. 5, but the Union appears to ignore the rest of the Magistrate's Memorandum Order which, when read as a whole, clearly indicates that the Court is required to determine whether or not the benefits at issue here vested before it can determine whether the Union's claims are subject to the relevant arbitration provisions.  As already discussed, the holding in <u>Litton</u>, as quoted by Magistrate Judge Benson, states that a post-expiration grievance can be said to arise under a contract, thereby giving rise to the presumption of arbitrability, only where, <u>inter alia</u>, "an action taken after expiration infringes on a right that accrued or vested under the agreement."  <u>Id.</u> at 3. It does not say that the presumption applies where the claim at issue is merely the type of claim that could be vested.  Further, Magistrate Judge Benson specifically stated that the issue in <u>Litton</u> was "whether the contractual right at issue 'vested or accrued' while the CBA was in effect."  <u>Id.</u>  He did not interpret the issue as being whether the contractual right at issue was the type that could be vested or accrued.  Indeed, contrary to the Union's suggestion, the <u>Litton</u> majority did not merely find that the right to have seniority considered in making layoffs was not the type of claim that could be vested but, as noted by Magistrate Judge Benson, it found that the right had, in fact,

8

not vested or accrued prior to the expiration of the contract.
Id. at 4.

Moreover, as the Union appears to acknowledge,
Magistrate Judge Benson clearly relied on the Third Circuit's
findings in Luden, which describes Litton as holding that "a
court has the *duty* to reach the merits of the claim, and can
order arbitration only if it concludes that the lapsed CBA in
fact creates the right or obligation at issue."  Id. at 6.  The
Luden Court did not find, nor did Magistrate Judge Benson, that
Litton stood for the proposition that the Court is precluded from
reaching the merits of the underlying dispute or that the Court
need only determine if the claim is the type that could be
vested.

Finally, following Magistrate Judge Benson's statement
that "the Court must 'make inquiry' into whether the right at
issue actually vested or accrued while the contract was in
force," he described his findings as requiring the court to
address the merits of the issue.[3]  Under these circumstances, the
Union's position that neither Litton nor Magistrate Judge
Benson's Memorandum Order requires the court to address the
merits of the dispute or to determine whether the benefits at

---

[3]         Specifically, Magistrate Judge Benson stated
         that, "To say, however, that in this case the
         court must address the merits of the issue,
         and, hence, that the parties are permitted to
         conduct discovery, is not to answer the
         precise question before the court: exactly
         what discovery is proper?"  Memorandum Order,
         p. 7.

9

issue here actually vested is not only without merit but is contrary to the law of the case.

As such, we turn to the issue of whether the benefits at issue in this case vested.

As a preliminary matter, we note that the Union has argued that, rather than follow Third Circuit precedent in deciding this issue, the Court should apply precedent as set forth by arbitrators who have decided vesting disputes because the parties in this case "bargained for ... a determination by an arbitrator." Plaintiff's Brief at p. 36 (C.A. No. 01-1751: Docket No. 44). Of course, the difficulty with the Union's argument, aside from the fact that it has offered no authority to support its position, is that it remains to be seen whether the parties bargained for this particular dispute to be arbitrated. Whether or not the parties agreed to arbitrate is a determination that is properly made by the Court and, under Third Circuit precedent, requires the Court -- not an arbitrator -- to decide whether the benefits at issue vested. <u>Litton</u>, <u>supra</u>. The fact that the Court may simultaneously resolve the issue that the Union seeks to arbitrate does not appear to be avoidable and nevertheless does not provide the basis for ignoring the law of the this circuit.

Indeed, in <u>Litton</u>, the Supreme Court expressly recognized that it could not avoid the duty of determining whether the parties agreed to arbitrate a post-expiration dispute simply because that determination would require it to interpret

the language of a bargaining agreement, a responsibility typically within the purview of the arbitrator.  Id. at 209.  In fact, the Court proceeded to do just that when, in order to determine whether the dispute over layoffs was arbitrable, it found that the right at issue in that case had not vested during the term of the Agreement.  Id. at 209-210.  Because the issue here, like in Litton, is whether the parties agreed to arbitrate in the first instance, it is an issue properly resolved by the Court under the precedent binding on this Court.

    We therefore turn to the Third Circuit's opinion in International Union, United Authomobiule, Aerospace & Agricultural Implement Workers of America v. Skinner Engine Co., 188 F.3d 130 (3d Cir. 1999)("Skinner"), which appears to govern the instant dispute.

    As found by the Court in Skinner, ERISA recognizes two types of employee benefit plans: employee welfare plans, which are at issue here, and employee pension plans.  Id. at 137.  Although pension plans have elaborate vesting requirements under ERISA, it does not require automatic vesting of welfare benefit plans.  Id.  As the Third Circuit has explained, the difference was not accidental, but, rather, a recognition by Congress that employers need some flexibility regarding their right to alter medical plans due to the fact that the "'costs of such plans are subject to fluctuating and unpredictable variables'" such as "'inflation, changes in medical practice and technology, and increases in the cost of treatment independent of inflation.'"

Id. at 138, quoting Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988).

It is undisputed, however, that "in some situations, a welfare plan may provide a vested benefit." In Re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 58 F.3d 896, 902 (3d Cir. 1995)("Unisys"). See Skinner, 188 F.3d at 138. It is the plan participant's burden to prove, by a preponderance of the evidence, that the employer intended the welfare benefits to vest for life. Id. at 138-39. The Court of Appeals for the Third Circuit, however, has cautioned that:

> to vest benefits is to render them forever unalterable. Because vesting of welfare benefit plans constitutes an extra-ERISA commitment, an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language.
>
> *     *     *
>
> These cautionary principles apply without regard as to whether the employee welfare benefits are provided under a collective bargaining agreement, SPD [summary plan description], or other plan document; the same underlying considerations are present irrespective of the particular type of document at issue.

Id. at 139. See Unisys, 58 F.3d at 902 ("[A]ny retiree's right to a lifetime medical benefit under a plan can only be found if established by the terms of the ERISA-governed employee benefit plan .... A court must examine the plan documents.")

It also appears undisputed that while collective bargaining agreements are generally governed by federal law, traditional rules of contract construction apply when not

12

inconsistent with federal labor law.  See Skinner, 188 F.3d at
138.  Moreover, how a plan document or CBA should be interpreted
is typically a question of law and where a CBA is clear and
unambiguous, its meaning must be determined as a matter of law.
Id.

In the instant case, PPG has represented, and the Union
does appear to dispute, that PPG and the Union have had a
collective bargaining relationship at the Springdale Plant since
1947 covering production and maintenance employees and since 1955
covering salaried employees.  PPG Exh. 20: Bono Aff. ¶ 4.[4]  Until
1969 and 1970, respectively, the CBAs covering salaried employees
and production and maintenance employees obligated PPG to
contribute a fixed dollar amount to the cost of medical insurance
for active employees only.  PPG Exh. 20: Bono Aff. ¶ 7.  The 1970
production and maintenance CBA, however, included Supplemental
Agreement No. 2, which provided that:

> 2.   Hospital, Surgical, Medical Insurance
>
> Effective December 1, 1970 the Company
> shall provide at its expense to active
> employees and pensioners, Hospital and
> Medical Insurance with benefits paralleling
> those provided in the Michigan Type Plan for
> Group Hospitalization and Surgical coverage.
> Effective November 1, 1971, the Company shall
> provide a prescription drug program-Michigan
> Type Blue Cross/Blue Shield at its expense to
> active employees and pensioners under age 65.
> Such benefits are more fully described in the
> Booklet entitled "Group Insurance Plans" for
> Hourly Employees of PPG INDUSTRIES, Inc., C&R
> Division, Springdale, Pennsylvania, a copy of

---

[4]      Unless otherwise indicated all of PPG's Exhibits
appear at Docket No. 106.

> which has been given to the Union and which,
> so far as benefits are concerned, is
> incorporated by reference as part of this
> Agreement.

PPG Exh. 1: 10/23/70 CBA, p. 29.  See PPG Exh. 20: Bono Aff. ¶ 7.

The August 1, 1969 CBA covering salaried employees provided for

these same changes but were to be effective October 1, 1969, for

hospital and medical insurance and August 1, 1971, for the

prescription drug program.  PPG Exh. 2: 8/1/69 CBA, Section 2, p.

14.  See PPG Exh. 20: Bono Aff. ¶ 8.  Moreover, it appears

undisputed that these provisions have been repeated in every

respective CBA thereafter except that in 1981, they began to

incorporate the Group Insurance Plan booklet ("GIP"), through

which retiree medical benefits were provided, rather than the

Michigan Plan.[5]  See PPG Exh. 20: Bono Aff. ¶¶ 9, 10.

It also appears that the October 10, 1970 GIP is the

first Springdale Plant GIP to provide for retiree medical

benefits.  Specifically, it provides that:

---

[5]    GIPs are also referred to as Summary Plan
Descriptions ("SPDs"), which is the moniker used
by the Union.  Because the booklets describing
the benefits in this case are called Group
Insurance Plans we have referred to them as GIPs.
We also note here that since 1990 the salaried
employee bargaining unit was apparently made part
of the production and maintenance employee
bargaining unit and, thus, there is currently
only one bargaining unit and one CBA.  PPG Exh.
20: Bono Aff. ¶ 4.

> Retirement
>
>      If you retire under the Pension
> Agreement or the Social Security Act, or upon
> the attainment of age 65, whichever shall
> occur sooner, the following provisions will
> be applicable to your coverage under the
> program:
>
>                  *      *      *
>
> (c)  Blue Cross and Blue Shield Benefits --
>
>      Such coverage will be continued in
>      effect thereafter, without cost to
>      you, in accordance with paragraph
>      6.5 [the Medicare offset
>      provision].

PPG Exh. 4: 10/23/70 GIP § 7.14.  See PPG Exh. 20: Bono Aff. ¶

15.  Each succeeding GIP, it appears, contains this provision as

well.  See PPG Exh. 20: Bono Aff. ¶ 16.

     PPG argues that there is not only no clear and express

language in any of these plan documents which would indicate a

commitment by PPG to vest retiree medical benefits but that the

language that is contained in the documents expressly limits

PPG's obligation in this respect.  Specifically, PPG points to

the fact that each Springdale Plant CBA since the November 1,

1981 CBA contains a termination clause which provides that:

>      Section 1.    This Agreement shall become
>      effective November 1, 1981, at 11:30 p.m. and
>      shall continue in effect until 12:00 noon,
>      October 27, 1984, and shall automatically be
>      renewed thereafter for a term of one (1) year
>      and from year to year thereafter, unless
>      terminated as hereinafter provided.

PPG Exh. 3: 11/1/81 CBA, Article XXVI, p. 26.  See PPG Exh. 20:

Bono Aff. ¶¶ 13, 14.

15

Moreover, it appears that each Springdale Plant GIP since 1984 contains a duration clause which states that:

> The Company will continue the benefits described herein for active and retired employees consistent with the terms and conditions of the labor agreement for the duration of such agreement.... In the event of termination of the labor agreement, you have the same rights as to claim submission and review and conversion rights as you would have under individual termination coverage.

PPG Exh. 5: 11/1/84 GIP, p. 5.  See PPG Exh. 20: Bono Aff. ¶¶ 17, 18.  It also appears that the Springdale Plant GIPs were provided to and reviewed by the Union before they were published.  PPG Exh. 20: Bono Aff. ¶ 19.  Under these provisions, it would appear that PPG's obligation to provide benefits was limited to the duration of the then-current CBA.

The Union does not dispute that these provisions are contained in the relevant plan documents nor does it point to any clear and express language in the plan documents which would suggest that PPG intended for retiree medical benefits to vest. Rather, the Union contends that it did not bargain for the duration clauses set forth in the GIPs and that, nevertheless, only the benefit terms were incorporated into the CBAs and not the duration clauses.

The Union, however, has not provided any support for its position that PPG unilaterally inserted the duration clause in the GIPs or that it was unaware of the fact that they had been included, but instead asks the Court to infer as much from the fact that the clause began appearing in the GIPs somewhere

between 1984 and 1987 and that it subsequently became an issue in 1993 after PPG first indicated that a modification in benefits might be forthcoming.[6]

Even if it were true, however, that PPG surreptitiously inserted the language in the GIP, it is undisputed that the language has been included in every Springdale Plant GIP since 1984 and that the Union reviewed each GIP prior to its publication.  Indeed, Mr. Murphy, formerly a union officer with the Union's predecessor who negotiated labor agreements with PPG, testified at his deposition that the Union had the opportunity to review each GIP and that if there were any mistakes or misstatements contained therein the Union would have an opportunity to call that to PPG's attention.  PPG Exh. 1: Murphy Depo. p. 125 (Docket No. 119).[7]  Under these circumstances, it appears unreasonable to infer that the Union was somehow unaware of the durational clause until 1993 when PPG decided to make changes in retiree medical benefits.  See Maurer v. Joy

---

[6]       Indeed, we note here that because the Union has merely incorporated the brief filed in opposition to PPG's motion for summary judgment at Civil Action No. 01-1751, most of the evidence cited by the Union relates to negotiations involving the ICWUC, and not the Steelworkers, and plan proposals pertaining to plants other than the Springdale Plant and, thus, cannot provide the basis for finding a material issue exists in this case.

[7]       Although the Union has referred the Court to a letter from the Union's Roy Albert to Herman Bono at PPG for the proposition that the Union only reviewed the changes made to the GIPs and not the entire document, the letter is devoid of any language to that effect.  See Union Exh. 6: 6/12/93 Letter.  Unless otherwise indicated all the Union's exhibits appear at Docket No. 116.

Technologies, Inc., 212 F.3d 907, 919 (6th Cir. 2000) (Finding
that the union was precluded from arguing that the plaintiffs'
retirement benefits vested in light of the reservation of rights
clause that, while unilaterally inserted by the company, was
conspicuously contained in the insurance booklet and remained
uncontested for three years.)

    Nor do we find persuasive the Union's argument that,
notwithstanding whether it was aware of the duration clause, it
was not included in the portion of the GIP that was incorporated
into the CBA.  To support its position, the Union cites to the
1996 Creighton, Pennsylvania CBA, which provides that: "A copy of
[the GIP] shall be provided to each plan participant and which,
so far as benefits are concerned, is incorporated by reference as
part of this Agreement."  See Union Exh. 5: Murphy Aff. ¶ 8.  The
Union then asserts based on this provision that the only items
being incorporated are the benefits themselves and not the
duration clause.  We disagree.

    First, it appears from this provision that the CBA
incorporated anything that "concerned" benefits.  Certainly, a
provision governing the duration of those benefits would appear
to fall under that category.  Second, not only has Mr. Murphy
attested to the fact that the booklets themselves, which fully
described the benefits contained therein, were incorporated into
the CBA's and not merely the benefit terms, PPG Exh. 12: Murphy
Aff. ¶ 8, but, as argued by PPG, the fact that the duration
clause became a "stumbling block" in the 1996 negotiations

18

because the Union wanted the language removed appears to suggests that the Union considered it to be part of the agreement in the first instance.

Finally, notwithstanding whether the duration clauses contained in the GIPs were incorporated into the CBAs, it is undisputed that the CBAs themselves contain a termination provision.  See PPG Exh. 3: 11/1/81 CBA, Article XXVI, p. 26. See PPG Exh. 20: Bono Aff. ¶ 13, 14.  Thus, it appears, rather than contain clear and express language which would demonstrate that PPG intended the retiree medical benefits to vest, the plan documents contain language indicating just the opposite.

The Union nevertheless argues that the plan documents, and in particular the language contained in the GIPs stating that PPG "will continue" the benefits at issue, are ambiguous, thereby requiring the Court to look beyond the plan documents themselves to decide the vesting issue.

The Court of Appeals for the Third Circuit, however, has specifically rejected the notion that under these circumstances the phrase "will continue" included in provisions providing medical benefits is ambiguous.  To the contrary, in assessing a series of CBAs containing the same "will continue" language at issue here, the Third Circuit found that:

> It cannot be said that the phrases clearly
> and expressly indicate vesting since there is
> simply no durational language to qualify
> these phrases.  That is, the CBAs do not
> state that retiree benefits "will continue
> for the life of the retiree," or that they
> "shall remain unalterable for the life of the
> retiree."  An equally reasonable

19

> interpretation is that the benefits "will
> continue until the CBA expires," or that they
> "shall remain ... until the CBA expires."
> Indeed, the latter interpretation appears to
> be the more reasonable in light of the
> durational provisions in all of the CBAs.
> Section 46 of the 1986-1989 CBA is
> illustrative: "This Agreement represents a
> complete resolution of all non economic items
> and shall, in all of its terms, remain in
> effect from July 1, 1986 until midnight, June
> 30, 1989 ...."  Read in conjunction with the
> durational clauses, the phrases could be
> interpreted to mean, for instance, that the
> medical benefits "will continue until
> midnight of June 30, 1989."

> *          *          *

> The phrases, "will continue" and "shall
> remain," as discussed above, are simply not
> susceptible to more than one reasonable
> interpretation, and they do not somehow
> render the CBA's incomplete or ambiguous.

Skinner, 188 F.3d at 141, 146.

The Union nevertheless attempts to distinguish this case from Skinner and argues that the differences require a finding that the "will continue" language found in the instant case is ambiguous.

The Union first contends that because other courts have reviewed language similar to the "will continue" language at issue here and have determined that such language is ambiguous or vests in favor of retirees this Court should as well.  In so arguing, the Union relies on a series of cases from the Court of Appeals for the Fourth and Sixth Circuits that have followed the Sixth Circuit's holding in International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1983), cert.

denied, 465 U.S. 1007 (1984)("Yard-Man"), in which it was found
that such "will continue" language creates a presumption that the
parties intended retiree welfare benefits to continue for life.
See U.A.W. v. BVR Liquidating, Inc., 190 F.3d 768 (6th Cir.
1999), cert. denied, 529 U.S. 1067 (2000); Keffer v. H.K. Porter
Co., 872 F.2d 60 (4th Cir. 1989); Smith v. ABS Industries, Inc.,
890 F.2d 841, 847 (6th Cir. 1989).  As acknowledged by the Union
elsewhere in its brief, however, the Court of Appeals for the
Third Circuit in Skinner specifically, and repeatedly, declined
to adopt what has been termed the "Yard-Man presumption" or Yard-
Man's interpretation of the relevant contract language.  Skinner,
188 F.3d at 139, 140, 141.  In fact, the Third Circuit
subsequently described its opinion in Skinner as creating a
presumption against vesting with respect to welfare benefit
plans.  Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc.
Employee Health and Welfare Plan, 298 F.3d 191, 196 (3d Cir.
2002).  Thus, it appears that the Union's reliance on Yard-Man
and its progeny is misplaced.

        Nor do the remaining cases cited by the Union compel a
different result as the plan documents in those cases, unlike in
this case, did not contain any clauses limiting the duration of
benefits or the terms of the agreement.  See Rossetto v. Pabst
Brewing Co., 217 F.3d 539 (7th Cir. 2000), cert. denied, 531 U.S.
1192 (2001); Bidlack v. Wheelabrator Corp., 993 F.2d 603 (7th
Cir.), cert. denied, 510 U.S. 909 (1993).  Thus, none of the
cases relied upon by the Union serves to find either that an

ambiguity exists in the plan documents or that the retiree benefits vested.

Similarly, the Union has cited several cases for the proposition that "surviving spouse" provisions, _i.e._, provisions that provide for continued medical insurance coverage for the surviving spouse of a retired employee until the spouse's death, evidence an intent to vest.  See United Rubber, Cork, Linoleum & Plastic Workers v. Pirelli Armstrong Tire Corp., 873 F. Supp. 1093 (M.D. Tenn. 1994); U.A.W. v. Loral Corp., 873 F. Supp. 57 (N.D. Ohio 1994), affirmed, 107 F.3d 11 (6th Cir. 1997).  These cases, however, also relied on the Yard-Man presumption which, as already discussed, the Court of Appeals for the Third Circuit has specifically rejected.  Skinner, 188 F.3d at 139, 140, 141. Moreover, as argued by PPG, there was no language contained in the documents in these cases that expressly limited the duration of the benefits to the term of the agreement as exists here. Thus, these cases do not appear to provide the basis for departing from Skinner or for finding that plan documents at issue in this case are ambiguous.

The Union also argues that because the provisions in the GIPs for Life, Accidental Death and other insurance programs have specific termination language attached to them that the absence of termination language in the plan documents with respect to retiree medical benefits suggests that the latter were intended to vest.  These provisions, however, as acknowledged by the Union, indicate that coverage is to end upon retirement and

does not serve to limit the duration of benefits enjoyed during retirement as is at issue here.  <u>See</u> Plaintiff's Brief, p. 53 (C.A. No. 1751: Docket No. 44); Plaintiff's "Memorandum of Law," pp. 6-7 (Docket No. 115).[8]  In this manner, the fact that the plan documents are devoid of language specifically pertaining to the termination of retiree medical benefits does not negate the other durational clauses contained in the relevant plan documents.  <u>Cf.</u> <u>Skinner</u>, 188 F.3d at 147 ("Silence on duration ... may not be interpreted as an agreement to vest retiree benefits in perpetuity.")

Further, the cases relied upon by the Union to support its position are, as before, <u>Yard-man</u> and <u>United Rubber, Cork, Linoleum & Plastic Workers v. Pirelli Armstrong Tire Corp.</u>, 873 F. Supp. at 1100, which relied upon <u>Yard-Man</u>.  While these courts may have found that the inclusion of specific durational limitations in other provisions of plan documents suggests that retiree benefits not so limited were intended to vest, they so found having first accepted the presumption that retiree benefits were intended to vest.  Proceeding under the opposite presumption -- that such benefits were not intended to vest -- as we must, the fact that other provisions may have separate durational language attached to them does not appear to overcome that

_____

[8]         We note here that the exhibits referred to in the Union's "Memorandum of Law" submitted in opposition to PPG's motion (Docket No. 115), appear to refer to the exhibits submitted in support of its "refiled" motion for summary judgment and appear as Exhibits 44 and 68 to the Affidavit of John J. Murphy at Docket Nos. 19 and 20.

presumption that the GIP limits the provision of medical benefits provided for therein to the terms of the CBA.  Thus, it does not appear that either <u>Pirelli</u> or <u>Yard-Man</u> provides the basis for finding an ambiguity or for ignoring <u>Skinner</u>'s requirement that an employer's commitment to vest retiree benefits must be stated in clear and express language in order to overcome the presumption against vesting.

The Union next suggests that an ambiguity exists in this case because, unlike in <u>Skinner</u>, the "will continue" language appears in the first GIP and, thus, could not merely refer back to prior plan documents as was found in that case. The Union's argument in this regard, however, does not appear applicable to the Springdale Plant.  Indeed, it appears that the Springdale Plant CBA dated October 23, 1970, which is the earliest of record and the first to provide benefits to pensioners, states that "the Company shall provide at its expense to active employees and pensioners ... Hospital and Medical insurance ... [and] a prescription drug program ...."  PPG Exh. 1: 10/23/70 CBA, Supplemental Agreement No. 2, p. 29.[9]  Thus, like in <u>Skinner</u>, the "will continue" language found in subsequent CBAs can certainly be viewed as referring back to previous plan documents.

---

[9]     Of course, it goes without saying that the GIPs referenced in the brief filed at C.A. No. 01-1751 (Docket No. 44), which the Union has incorporated here, have no relevancy to the instant motion as they concern PPG's plant located in Martinsville, West Virginia, not the Springdale Plant, and pertain to CBAs negotiated with the ICWUC and not the Steelworkers.  <u>Id.</u> at pp. 53-4.

Moreover, the import of _Skinner_'s findings in this regard, as the Union itself has argued, is that the contract must be viewed as a whole and the phrase "will continue" must be read in context rather than in a vacuum.  Here, it is undisputed that since 1984 the Springdale Plant GIPs contains a durational clause limiting PPG's obligation with respect to retiree benefits to the term of the CBA.  It would therefore appear that when read in context the "will continue" language to the extent that it appears in any of the CBAs can be read only to suggest that benefits will continue for the duration of the CBA.

Indeed, it appears significant that in addressing this issue, the Court in _Skinner_ cites to _Senn v. United Dominion Industries, Inc._, 951 F.2d 806, 816 (7th Cir. 1992), _cert. denied_, 509 U.S. 903 (1993), in which the first CBA entered into between the parties also contained "will continue" language in the provisions providing for insurance benefits for retired employees.  _Id._ at 808.  The Court nevertheless found that "it requires more than a statement in a CBA that welfare benefits 'will continue' to create an ambiguity about vesting, for the logical interpretation under our rule is that benefits 'will continue' for the duration of the contract."  _Id._ at 816.  Thus, even if the first CBA at issue in this case contained the "will continue" language, it appears of little significance as it does not create an ambiguity or negate the fact that under _Skinner_ there must be clear and express language to overcome the presumption against vesting, which is clearly absent here.

The Union also suggests that an ambiguity exists in this case because the Court in <u>Skinner</u> found, at least in part, that the "will continue" language was unambiguous because it applied to benefits for both active and retired employees and that because benefits for active employees cannot vest, it followed that they did not vest for the retired employees either. Although the Union argues that the "will continued" language in the GIPs in effect when the Union participants retired in this case only applied to retirees, thereby distinguishing itself from <u>Skinner</u>, the record is to the contrary.  Indeed, the 1984 GIP specifically states that, "the Company will continue benefits ... for active and retired employees ...."  PPG Exh. 5: 11/1/84 GIP, p.5.  Moreover, the provisions in the 1987 CBA and 1990 GIP cited by the Union, like in <u>Skinner</u>, do not appear to distinguish between active and retired employees and, thus, cannot provide the basis for finding that benefits vested.  <u>See</u> Plaintiff's "Memorandum of Law," pp. 5, 8 (Docket No. 115).  <u>See</u> <u>also</u> <u>Skinner</u>, 188 F.3d at 144.[10]

Finally, the Union argues that an ambiguity in the plan documents exists as evidenced by the fact that PPG failed to

_____

[10]     As previously discussed, to the extent that the Union has again relied on the ICWUC's brief filed in C.A. No. 01-1751, to support its argument here, we note that the only evidence cited therein concerns PPG's plants located in Martinsville, West Virginia and Circleville, Ohio, and CBAs negotiated by the ICWUC and not the Steelworkers.  <u>See</u> Plaintiff's Brief, p. 54 (C.A. No. 01-1751: Docket No. 44).  Because these documents have no relevance to the Springdale Plant, they cannot provide the basis for finding that an ambiguity exists here.

include a "reservation of rights" provision in any of the GIPs, except for that pertaining to the Memphis Plant.  Having included a reservation of rights clause in the Memphis GIP, the Union appears to suggest that PPG's deliberate omission of one in the GIPs governing its other plants somehow nullifies the duration clauses contained therein.  The Union, however, has cited no authority for its position or any that would support a finding that a reservation of rights clause must be included in order to express the intent that benefits were not to vest.  Perhaps the Union has not done so in light of <u>Skinner</u>, which demonstrates that under the law of this circuit a duration clause alone can effectively minimize an employer's obligation to provide retiree welfare benefits.

Moreover, as argued by PPG, a reservation of rights clause and durational language serve two different purposes. While the former permits an employer to modify or terminate benefits at any time, a durational clause precludes an employer from doing so as long as the CBA is in effect.  Thus, the absence of a reservation of rights clause in the Springdale Plant GIPs merely prevented PPG from modifying or terminating any benefits while the relevant CBA was still in effect and does not, as the Union would have us find, undermine the duration clause or demonstrate an ambiguity in the plan documents.[11]

---

[11]    We decline to alter our findings here based on the Union's Notice of New Authority filed on September 29, 2005.  Not only is the case upon which it relies an unpublished case from the District of Arizona but its cursory finding that

(continued...)

It therefore appears that the plan documents pertaining to the Springdale Plant are not only devoid of clear and express language indicating PPG's intent to vest retiree welfare benefits, but they are without ambiguity, thereby precluding a finding that PPG intended for retiree medical benefits to vest.[12]

---

[11]     (...continued)
"contrary inferences as to intent are possible" on the limited facts developed is of little help. ASARCO v. United Steel Workers of America, 2005 U.S. Dist. LEXIS 20873 *9 (D. Az. July 26, 2005). Moreover, to the extent that the Court found the language in the CBA ambiguous because it provided that benefits "shall continue," it appears contrary to the Third Circuit's finding in Skinner. Further, with respect to the reservation of rights ("ROR") issue, the CBA in that case contained a clause stating that "health benefits provided are 'subject to the rules and regulations of the Plan not in conflict with [the CBA].'" Id. at * 12. Because the CBA provided for what could be vested benefits, the Court found that the ROR in the SPDs, which was not bargained for, was subordinate to the CBA and could not affect what could be contractually vested or bargained for rights. Not only are the facts in our case distinguishable with respect to language and documents but it does not appear that the question of whether the defendants acquiesced to the inclusion of the ROR or whether they waived their right to object to its insertion was addressed by the Court. Having found that the Union, in fact, waived its right to object to the duration clause at issue here, ASARCO does not appear to compel a different result.

[12]     Having so found, we reiterate here that it is the plan documents that control and which the Court must assess to determine whether the right to lifetime benefits has been established. Unisys, 58 F.3d at 902. While we are mindful of the fact that extrinsic evidence may be used to determine whether an ambiguity exists in a plan document, it may not be used to create an ambiguity where none exists. See Skinner, 188 F.3d at 145. Indeed, quoting from Bidlack v. Wheelabrator Corp., 993 F.2d at 608, the Court in Skinner opined that before extrinsic evidence should be considered, "there must be either contractual language on which to hang the label of ambiguous
                                              (continued...)

As such, the grievance which the Union seeks to arbitrate cannot be said to arise under the contract and, thus, PPG cannot be compelled to arbitrate under the expired CBAs. Litton, supra.

For these reasons, it is recommended that defendant's motion for summary judgment pertaining to plaintiff's claims regarding defendant's Springdale, Pennsylvania Plant (Docket No. 104) be granted, and that plaintiff's refiled motion for summary judgment (Docket No. 94) be denied.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond

---

[12]        (...continued)
            or some yawning void ... that cries out for an
            implied term. Extrinsic evidence should not be
            used to add terms to a contract that is plausibly
            complete without them." Skinner, 188 F.3d at
            146. Because it appears that no ambiguity exists
            in the plan documents at issue here we have not
            considered the extrinsic evidence submitted by
            the Union. It should nevertheless be noted that
            the evidence submitted by the Union consists
            largely of documents other than plan documents
            and testimony from Union officials that benefits
            were meant to vest or statements allegedly made
            to them by PPG representatives to the same
            effect. The Court of Appeals for the Third
            Circuit has held, however, that neither
            testimonies of union members as to their belief
            regarding the duration of retirement benefits nor
            an employer's oral undertakings serve to modify
            the written terms contained in plan documents
            that are otherwise complete. Skinner, 188 F.3d
            at 145-147. See Depenbrock v. CIGNA Corp., 389
            F.3d 78, 81-82 (3d Cir. 2004)(ERISA requires that
            all employee benefit plans be established and
            maintained pursuant to a written instrument and
            precludes oral or informal amendments.) It
            therefore appears that even if the Court were to
            consider the Union's extrinsic evidence it would
            not compel a different result.

thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,


/s/ Amy Reynolds Hay
AMY REYNOLDS HAY
United States Magistrate Judge


Dated:    30 September, 2005.


cc:  Hon. David S. Cercone
     United States District Judge

     Michael J. Healey, Esquire
     Healey & Hornack
     Law & Finance Building, Fifth Floor
     Pittsburgh, PA 15219

     Sally M. Tedrow, Esquire
     O'Donoghue & O'Donoghue
     4748 Wisconsin Avenue, NW
     Washington, DC 20016

     Richard J. Antonelli, Esquire
     Spilman Thomas & Battle, PLLC
     One Oxford Centre, Suite 3440
     301 Grant Street
     Pittsburgh, PA 15219

Melvin P. Stein, Esquire
United Steel Workers of America
Five Gateway Center
Room 807
Pittsburgh, PA 15222

William T. Payne, Esquire
Schwartz. Steinsapir, Dohrmann & Sommers
1007 Mt. Royal Boulevard
Pittsburgh, PA 15223

John E. Stember, Esquire
Edward J. Feinstein, Esquire
Pamina Ewing, Esquire
Stephen M. Pincus, Esquire
Stember Feinstein Krakoff
429 Forbes Avenue
1705 Allegheny Building
Pittsburgh, PA 15219